OPINION
{¶ 1} J.A. appeals from a judgment of the Greene County Court of Common Pleas, Juvenile Division, which granted permanent custody of his two biological children to Greene County Children Services ("GCCS"). *Page 2 
 {¶ 2} On appeal, J.A.'s attorney filed a brief pursuant to Anders v.California (1967), 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493, wherein he proposed one possible assignment of error based on the weight of the evidence, but concluded that it lacked arguable merit. We advised J.A. that his counsel had filed an Anders brief, and we invited J.A. to file his own brief. J.A. submitted a letter to the court, which we will treat as his pro se brief.
 {¶ 3} We have thoroughly reviewed the record in this case, and we agree with J.A.'s attorney that there are no potentially meritorious issues presented. The judgment will be affirmed.
 I {¶ 4} The state's evidence established the following:
 {¶ 5} J.A. and his estranged wife, D.A., are the parents of a daughter and a son. The daughter was born in 1992, and the son was born in 1996. J.A. physically abused D.A. during the marriage, and D.A. had at least one affair. J.A. also physically and verbally abused the son. J.A. suffered from obsessive compulsive disorder, which caused conflict within the family, and D.A. suffered from mental illness.
 {¶ 6} According to the daughter, she was "viciously" raped by J.A. when she was eleven years old on two separate occasions, several months apart. After the second rape, the daughter reported the incidents to her mother, but the family did not report the incidents to the police. Thereafter, J.A. moved out, and D.A. and the children lived with D.A.'s boyfriend.
 {¶ 7} Because D.A. was unemployed and unable or unmotivated to care for the children, the daughter took on many adult responsibilities in the household. D.A.'s *Page 3 
boyfriend began a sexual relationship with the daughter when she was twelve, which continued for approximately two years. The daughter perceived that it was her "job" to submit to the sexual abuse because the family was in dire financial straits and depended on the boyfriend for income. D.A. knew about the sexual relationship between her daughter and the boyfriend and did not intervene. When the daughter became pregnant, D.A. took her to a clinic for an abortion, where the daughter stated that she had been raped. Medical personnel called the authorities due to inconsistencies in the daughter's story and the fact that the alleged rape had not been reported. During the investigation, the daughter recanted the rape claim she had made at the clinic and admitted to her involvement with the boyfriend. The boyfriend was arrested, and the daughter was placed in the temporary custody of GCCS.
 {¶ 8} In the days following D.A.'s boyfriend's arrest and the daughter's removal from the home, D.A.'s mental condition deteriorated. She attempted to convince the son to commit suicide with her, but he refused. She shot herself in the chest at home a few days after the daughter and the boyfriend left. The son found her when he came home from school. D.A. tried to convince the son not to call for help because she did not trust the police, but when a detective coincidentally called the house, the son reported that his mother was injured, and the detective sent help. The son was placed in the temporary custody of GCCS when his mother went to the hospital. The children were placed in a foster home together.
 {¶ 9} GCCS developed a case plan aimed at reunification. However, caseworkers and psychologists testified that, in the aftermath of these events, the children were "emphatic" that they did not want any contact with J.A. . J.A. also did not *Page 4 
complete a polygraph test or a sex offender assessment, as requested by caseworkers. Thus, GCCS eventually moved for permanent custody. D.A. agreed that it was in the children's best interest to place them in the permanent custody of GCCS, and she voluntarily surrendered her parental rights. J.A. contested the termination of his parental rights.
 {¶ 10} After conducting a hearing and in camera interviews with the children and reviewing psychological evaluations and the report of the guardian ad litem, the trial court granted GCCS's request for permanent custody.
 II {¶ 11} J.A.'s attorney raises one potential assignment of error on appeal, which challenges whether the court's conclusion was against the manifest weight of the evidence. We agree with counsel that this argument is frivolous.
 {¶ 12} R.C. 2151.353(A)(4) sets forth the circumstances under which a court may grant permanent custody of an abused, neglected, or dependent child to a children services agency. The court may grant permanent custody of a child to the agency if the court determines that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent and determines that permanent commitment is in the best interest of the child. In a proceeding for the termination of parental rights, all of the court's findings must be supported by clear and convincing evidence. R.C. 2151.414(E); In re J.R., Montgomery App. No. 21749, 2007-Ohio-186, at ¶ 9. However, the court's decision to terminate parental rights will not be overturned as against the manifest weight of the evidence if the record contains competent, credible evidence by which the court could *Page 5 
have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established.In re Forrest S. (1995), 102 Ohio App.3d 338, 344-345; see, also,Cross v. Ledford (1954), 161 Ohio St. 469, paragraph three of the syllabus.
 {¶ 13} D.A. decided that it was in the children's best interest to be placed in the permanent custody of GCCS and voluntarily surrendered her parental rights. Thus, the issues before the trial court were whether the children could be placed with J.A. within a reasonable time and whether permanent commitment was in the best interest of the children.
 {¶ 14} The children raised serious allegations of physical and sexual abuse against J.A. which were never disproved. Although J.A. denied raping the daughter or physically abusing any member of the family, he refused to submit to a polygraph test or a sexual batterer's assessment, as requested by the caseworker. J.A. had not seen the children for an extended period of time and had no relationship with them at the time of the hearing. The children seemed to have no attachment to him and to be repulsed by his hygiene and personal habits. The son also expressed fear that he would be sexually abused by his father the way his sister had been. The psychologist who evaluated the children stated that "part of the reason both [the son] and [the daughter] were so vulnerable to [the boyfriend] was that they had had such a negative experience with their biological father and so they were receptive to the minor overtures that [the boyfriend] made to give them some support and positive regard" at the beginning of their relationship. The psychologist also concluded that J.A. had not "effectively compensated for [D.A.'s] emotional instability and limitations." The *Page 6 
children had responded well to their foster family and to psychological treatment, which their therapist recommended that they continue.
 {¶ 15} The psychologist who evaluated J.A. recommended that he submit to a polygraph due to the "lack of clarity in this case" and that any contact between J.A. and his children be supervised. The guardian ad litem stated that the stability the children felt in their foster home placement was "of utmost importance" and recommended that they stay in their foster placement.
 {¶ 16} The children's strong desires not to have contact with J.A. were entitled to significant weight in light of the allegations of sexual, verbal, and physical abuse against him. The court reasonably concluded that J.A. had not presented a justifiable reason for his failure to have contact with the children over an extended period of time and that he had failed to comply with the goals of the case plan. Based on the very traumatic events that the children had experienced in their lives, J.A.'s extended absence from their lives, the allegations that he had abused them, and the absence of any evidence that J.A. might be equipped to help them deal with or to protect them from traumatic events, the trial court reasonably concluded that the children could not be placed with him within a reasonable period of time and that placement with GCCS was in the children's best interest. We agree with appellate counsel that the argument that the trial court's judgment was against the manifest weight of the evidence is frivolous.
 {¶ 17} In his pro se brief, J.A. contends that two of his five siblings had not been contacted about assuming custody of his children and that they "may both be interested." He also claims that D.A., her boyfriend, and her family made it impossible *Page 7 
for him to have contact with his children and that, under these circumstances, the trial court should not have held the lack of contact against him. He contends that the boyfriend manipulated his daughter into accusing him of sexual abuse. Finally, he claims that he is now willing to take a polygraph test.
 {¶ 18} The credibility of the witnesses and the weight to be given to their testimony were matters for the trial court, as the finder of fact, to resolve. State v. DeHass (1967), 10 Ohio St.2d 230, 231; State v.Terry, Darke App. No. 1730, 2008-Ohio-6738, at ¶ 46. The trial court was not required to credit J.A.'s claims that D.A. and her boyfriend were responsible for his lack of contact with the children. By his own admission, J.A. made very little effort to facilitate such contact and had not had any arranged contact with the children in over three years. Likewise, the trial court was not required to credit J.A.'s claims that the daughter's rape allegations had been fabricated or that D.A. and her boyfriend had coached her in making these allegations.
 {¶ 19} J.A.'s claims that two of his siblings had not been contacted by the court and "may" be interested in custody are unsubstantiated and, in any event, involve matters outside the record that cannot be addressed on direct appeal. State v.Combs, Montgomery App. No. 22712,2009-Ohio-1943, at ¶ 19, citing State v. Madrigal (2000),87 Ohio St.3d 378, 390-392. The caseworker testified that there were no relatives on either side of the family who were suitable and willing to take custody of the children. We note, however, that R.C. 2151.353(A) does not require a juvenile court to consider placing the children with a relative prior to granting the permanent custody request of an agency. Courts are not required to favor a relative if, after considering all the factors, it is in the child's best interest for the agency to be granted permanent custody. *Page 8 In re A.V., Lawrence App. No. 08CA31, 2009-Ohio-886, at ¶ 17; In reWilkenson (Oct. 12, 2001), Hamilton App. No. C-010402, C-010408. Relatives seeking the placement of the child are not afforded the same presumptive rights that a biological parent receives as a matter of law, and the willingness of a relative to care for the child does not alter the statutory factors to be considered in granting permanent custody.In re A.V., supra.
 {¶ 20} Although J.A. claims to have had a change of heart about submitting to a polygraph test, the fact remains that he did not submit to such a test in time for the trial court to consider the results in making its decision. We must confine our review to the evidence before the trial court. App. R. 12(A)(1)(a); App. R. 9(A). {¶ 21} J.A.'s assignments of error are frivolous.
 IV {¶ 22} Finally, we have conducted an independent review of the trial court's proceedings, as required by Anders, 386 U.S. 738, and have found no errors having arguable merit.
 III {¶ 23} The judgment of the trial court will be affirmed.
DONOVAN, P.J. and FAIN, J., concur. *Page 1