[Cite as *In re S.F.*, 2020-Ohio-693.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| IN RE: S.F. | : | Appellate Case No. 28606 |
| | : | |
| | : | Trial Court Case No. 2018-0268 |
| | : | |
| | : | (Appeal from Common Pleas Court – |
| | : | Juvenile Division) |
| | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 28th day of February, 2020.

. . . . . . . . . . .

MATHIAS H. HECK JR., by SARAH E. HUTNIK, Atty. Reg. No. 0095900, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
    Attorney for Appellee, MCCS

SARA M. BARRY, Atty. Reg. No. 0090909, 1139 Holly Avenue, Dayton, Ohio 45410
    Attorney for Appellant, Father

. . . . . . . . . . . . .

FROELICH, J.

{¶ 1} Following a hearing, the trial court awarded permanent custody of S.F., a minor child, to Montgomery County Children Services ("MCCS"). S.F.'s father ("Father") alone appeals from that judgment. The judgment of the trial court will be affirmed.

**Factual and Procedural Background**

{¶ 2} On November 11, 2017, Hamilton County Children Services ("HCCS") obtained emergency custody of S.F., who was then two months old. (*See* Stipulations, ¶ 1, 5.)[1] The Hamilton County Juvenile Court thereafter held an adjudication hearing at which both Father and S.F.'s mother ("Mother") appeared. During that hearing, Mother admitted to abusing prescription drugs and heroin "for several years;" she also had been treated for a heroin overdose while 21-weeks pregnant with S.F. (*Id.* at ¶ 6.) Father, who resided in Montgomery County, admitted to a substance abuse problem as well. (*Id.* at ¶ 7-8.)

{¶ 3} On December 19, 2017, the court adjudicated S.F. dependent and placed him in HCCS's custody "on an interim basis." (*Id.* at ¶ 10.) The court declined to place S.F. with Father's mother ("Paternal Grandmother") due to "a substantiated report of sexual abuse" against her husband (*see* Guardian Ad Litem Report, p. 1), and HCCS was unable to locate a suitable placement with any other relative. (Stipulations, ¶ 9-10.)

{¶ 4} By agreement of the parties, S.F.'s case was transferred to the Montgomery County Juvenile Court on February 8, 2018. (*Id.* at ¶ 11-12.) Because Mother was incarcerated and Father's whereabouts were unknown, neither parent attended a July 6,

---

[1] Although the record from the Hamilton County case does not appear in the record before us, the parties have stipulated in this appeal to certain rulings issued in that case and to certain other relevant facts. The same stipulations appear in the transcript of the final custody hearing. (Tr. p. 7-15.)

2018 hearing that resulted in a grant of interim temporary custody to MCCS. (*Id.* at ¶ 13.) Following an August 21, 2018 hearing that both parents did attend, the court granted temporary custody to MCCS, to expire on November 13, 2018. (*Id.* at ¶ 14.) At the same time, the court granted weekly visits with S.F. in Paternal Grandmother's home, to begin in September 2018. (*Id.*)

{¶ 5} On October 22, 2018, MCCS filed a motion for an extension of temporary custody. As a result of an annual review on October 23, 2018, the trial court terminated Paternal Grandmother's in-home visits and deemed both Mother and Father to have tested "positive" due to their failure to complete a court-ordered drug screen. (*Id.* at ¶ 16.) On November 26, 2018, after S.F. had been in the agency's care for more than a year, MCCS moved for permanent custody. (*Id.* at ¶ 20.) Mother and Father responded with separate motions requesting that Paternal Grandmother be granted legal custody instead.[2]

{¶ 6} A hearing on all pending motions was held before a magistrate on February 20, 2019 and March 13, 2019. However, upon Father's filing of objections to the magistrate's decision on those motions, it was discovered that the hearing had not been recorded and could not be transcribed. Consequently, the magistrate's decision was vacated and the matter was set for a new hearing. In the interim, MCCS filed an amended motion for permanent custody, adding a claim of abandonment based on Mother and Father's extended absences from authorized visits with S.F.

---

[2] Paternal Grandmother filed her own motion to intervene and for custody of S.F. on January 30, 2019, but withdrew that motion after Mother and Father filed theirs. (*See* Stipulations, ¶ 20; Tr. p. 5-6.)

{¶ 7} At the outset of the September 3, 2019 hearing reset on the custody motions, the parties entered into various stipulations for the record. Next, the State submitted an exhibit evidencing Father's August 19, 2019 guilty plea to possessing drug abuse instruments (specifically, a syringe) on April 9, 2019. (Tr., State's Exh. 8.) That exhibit was admitted without objection. The State then presented six witnesses.

{¶ 8} Officers Karina Sulek and Douglas Gresham of the Dayton Police Department testified consecutively about responding to a report of someone being unconscious in a vehicle on the morning of August 16, 2019. Officer Sulek testified that upon arriving at the scene, she found medics already there and Mother in the car's front passenger seat, Father in the backseat, and a woman who identified herself as Mother's mother ("Maternal Grandmother") in the driver's seat. Father told Officer Sulek that he had snorted "Coke"[3] that day. Officer Sulek said Father "was very drowsy"; "his eyes were pinpoints," he had "marks" on his arm, and "his speech was kind of mumbled, he was difficult to understand at times." (Tr. p. 21.) Although Father told Sulek that the marks on his arm were from poison ivy, Officer Sulek testified that those marks "appeared to be from drug use." (Tr. at p. 22.) According to Officer Sulek, Mother "had pinpoint eyes as well" and "her speech was slurred." (Id.) Like Father, Mother claimed that marks on her arm were "poison ivy," but acknowledged that she was a recovering drug user. (Id.) Mother denied taking any drugs that day.

{¶ 9} Officer Sulek said Father was transported to Miami Valley Hospital by ambulance. While sitting outside his room, Officer Sulek overheard Father say "his skin was crawling with bugs." (Tr. p. 24.) Based on her experience, Officer Sulek opined that

---

[3] Officer Sulek testified that she understood Father to mean cocaine.

Father appeared to be hallucinating. (Tr. p. 25.) Although Mother had said she would meet them at the hospital, Officer Sulek did not see her there. Officer Sulek testified that Mother told her that the group had been on their way to visit Mother's child at children services when the police encountered them. (Tr. p. 26.)

{¶ 10} Officer Gresham offered similar testimony about the August 16 encounter with Father and Mother, stating that Father was "super fidgety" and "showing signs of an overdose." (Tr. p. 36-37.) Officer Gresham testified that, once at the hospital, Father said he had used cocaine, heroin, and methamphetamine that day. Gresham said Father also told him (Gresham) that Father, Mother, and Maternal Grandmother had been headed to children services for visitation with a child. Although he confirmed that Mother denied using any drugs that day, Officer Gresham said Mother "was showing signs of an overdose." (Tr. p. 39.) However, he said she refused any medical treatment, saying that Maternal Grandmother would take her to the hospital if she (Mother) "ha[d] a problem." (Id.) When Father was discharged from the hospital, Officer Gresham booked him into the Montgomery County Jail on an outstanding warrant.

{¶ 11} Next, S.F.'s foster mother ("Foster Mother") testified about her experience caring for him since March 20, 2018. Although she described him as "developmentally behind" when he first entered her care, Foster Mother said that S.F.'s development was "on target" at the time of the hearing. (Tr. p. 48.) She said that S.F. was diagnosed with asthma in September 2018, however, and for a period of time required "a once a day daily inhaler" and "a rescue inhaler to use as needed." (Tr. p. 50.) According to Foster Mother, when S.F. attended his first visitation in Paternal Grandmother's home in September 2018, he returned "smell[ing] like * * * cigarette smoke," and Foster Mother had to take

him to urgent care for "wheezing and labored breathing." (Tr. p. 52-54.) She said that since then, S.F. "is supposed to be in a smoke[-]free environment." (Tr. p. 50.) Foster Mother relayed that restriction to MCCS, but S.F. returned from two subsequent visits to Paternal Grandmother's home again smelling of smoke and requiring trips to urgent care for labored breathing. The in-home visits ended after September 24, 2018. As of the hearing date, Foster Mother said S.F. had not had to use either inhaler since March or April of 2019.

{¶ 12} The State called Monica Burton, a child welfare supervisor with MCCS who was responsible for overseeing S.F.'s case. Burton said that in trying to find the "least restrictive" placement for S.F., MCCS initially had considered Paternal Grandmother's home as a possible option. However, their review of a state-wide database revealed that Hamilton County had ruled out that placement because Paternal Grandmother's husband ("T.J.") "was involved in several cases where * * * sexual abuse [was substantiated] and he was listed as the alleged perpetrator." (Tr. p. 86-87.) Burton said those cases involved children who had been present in Paternal Grandmother's home.

{¶ 13} Because Paternal Grandmother continued her relationship with T.J. despite knowing of the sexual abuse allegations, the child services agencies that investigated the abuse complaints[4] "were concerned about her protective capacity." (Tr. p. 87.) Burton testified she told Paternal Grandmother that in order to obtain custody of S.F., Paternal Grandmother "needed to have her own independent housing * * * away from [T.J.]" and "would need to have sufficient income to meet all of [S.F.'s] needs." (Tr. p. 91.) Burton

---

[4] Burton indicated that the children involved in the sexual abuse allegations lived in Greene and Clinton Counties, so the investigations were conducted by agencies from those two counties.

also told Paternal Grandmother that Mother and Father could not be living in the home due to "ongoing substance abuse concerns." (*Id.*) Burton was aware that Paternal Grandmother had custody of C.F., S.F.'s older brother, through an earlier custody proceeding in Clinton County. However, Burton questioned whether Clinton County was aware that T.J. was living in the same home.

{¶ 14} A home study begun by MCCS in July 2018 concluded that Paternal Grandmother would not provide a suitable placement for S.F. (Tr., Exh. 4.) Burton testified that she still did not consider Paternal Grandmother's home an appropriate placement due to concerns about her protective capacity, her continuing to live with T.J., her ability to maintain appropriate boundaries (with Father and Mother), and her ability to maintain stable employment and support the children in her care. Most recently, Burton had learned that another infant – Father's grandchild ("N.") – also was living in Paternal Grandmother's home, along with S.F.'s brother, C.F. The presence of an additional child added to Burton's concerns.

{¶ 15} Serah Siemann, S.F.'s court-appointed guardian ad litem ("GAL"), testified that she first met Paternal Grandmother when examining her home in August 2018. Siemann had recommended that S.F. have visitation in that home beginning in September 2018, "to see how that would work." (Tr. p. 131.) Siemann said she became concerned, however, when S.F. reportedly smelled of cigarette smoke and experienced labored breathing after his first visit there. When she asked Paternal Grandmother to maintain a smoke-free environment in S.F.'s presence, Paternal Grandmother denied that anyone had smoked around him, but S.F. again was reported to smell of smoke and experience breathing problems after subsequent visits. Siemann then asked the court to

terminate the in-home visits. Although Paternal Grandmother was permitted to have monthly visits with S.F. at MCCS thereafter, Siemann said Paternal Grandmother had visited the child only three times between October 2018 and the September 2019 hearing.

{¶ 16} Siemann testified to having additional concerns when she "confronted" Paternal Grandmother regarding the sexual abuse allegations against T.J. and Paternal Grandmother denied knowing about the allegations, even though reports on the investigations into those allegations included "very * * * detailed" discussions about Paternal Grandmother. (Tr. p. 134.)[5] Siemann said Paternal Grandmother was unable to explain those inconsistencies.

{¶ 17} Siemann said she recently learned that in addition to having custody of S.F.'s older brother, C.F., Paternal Grandmother also had physical custody of N., an infant who is the child of another son of Father's. She said N. would fall under the authority of Greene County Children Services. When Siemann made an "unannounced" visit to Paternal Grandmother's home the day before the hearing, Mother answered the door. Paternal Grandmother was not at home, but Father was in the bedroom with C.F., a woman carrying an infant walked out of Paternal Grandmother's bedroom, "[t]here was a girl sleeping on the couch, and also another female in the home." (Tr. p. 140.) Siemann testified to feeling "uncomfortable;" she said "a lot of people were in the home" and Father "appeared to be a little nervous that I was there", so Siemann left before Paternal Grandmother returned. (Tr. p. 141.)

---

[5] Siemann did not elaborate on the nature of the reports' discussions about Paternal Grandmother. However, a copy of a "case summary" dated November 13, 2011 and appended to an exhibit admitted at trial reports that one of T.J.'s alleged victims told a Clinton County sexual abuse screener that Paternal Grandmother called the victim "a liar" when the victim told Paternal Grandmother about T.J.'s abuse. (Tr. Exh. 4.)

**{¶ 18}** Siemann testified that Paternal Grandmother's current lease allowed for one adult and no more than two children living in that apartment. (*See* Tr., Father's Exh. A.) She opined that S.F. could not live there with both C.F. and N. under the terms of that lease. She also opined that Paternal Grandmother lacked "any significant bond" with S.F.; "I believe since he's been born she's only seen him a total of nine times[,] roughly." (Tr. p. 141.) Further, Siemann had seen no evidence that Paternal Grandmother had current employment or a stable income. Although Siemann had asked Paternal Grandmother for statements evidencing disability income she claimed to receive, Paternal Grandmother had produced no documentation. Finally, Siemann expressed concern about both Mother's and Father's having ongoing substance abuse issues, no sustained periods of sobriety, and no stable housing or income. She recommended that S.F.'s best interest would be served by awarding permanent custody to MCCS.

**{¶ 19}** On cross-examination, Siemann said that although C.F. seemed to be doing fine in Paternal Grandmother's home, she (Siemann) was concerned about his being around Mother and Father there without supervision. She noted recent evidence of Mother's and Father's active drug use. She also expressed concern about the presence of so many people in the home. Siemann said that one woman present during the unannounced visit identified herself as the baby's maternal grandmother, and identified another woman as the mother of the infant (N., Father's grandchild). Prior to the hearing, Siemann had confirmed the existence of an outstanding warrant for N.'s mother.

**{¶ 20}** Shanta Anderson testified as S.F.'s caseworker since his case was transferred to Montgomery County in February 2018. From the outset, Anderson was aware of concerns about Mother's and Father's substance abuse and lack of housing and

income. MCCS created a case plan and worked with S.F.'s parents toward achieving objectives that would permit reunification. Due to transportation issues affecting visitation, S.F. was transferred in March 2018 from his then-existing foster home in Hamilton County to a foster home in Montgomery County, where he had remained since.

{¶ 21} Anderson said the main case plan objectives were for Mother and Father to obtain and maintain income and safe and stable housing, to complete an agency-approved parenting class, and to obtain a substance abuse assessment and follow all resulting recommendations. They also were expected to demonstrate a period of sobriety, to submit to additional drug screens, and to consistently participate in visitation with S.F. In addition, Father was asked to complete a parenting psychological evaluation[6] and Mother was asked to resolve outstanding legal issues and avoid further criminal activity. Anderson stated that Father completed the parenting class requirement. However, a parenting class that Mother attended while incarcerated[7] was not agency-approved. By February 2019, Mother still had not complied with MCCS's parenting class requirement, and neither parent had achieved the plan's remaining objectives.

{¶ 22} As to housing, Anderson testified that Mother and Father maintained a residence together in New Vienna, Ohio for three or four months in 2018, but Father was unable to afford the rent after Mother was incarcerated. Although Anderson referred Father to Job and Family Services near New Vienna (in another county), Father did not pursue that resource. Anderson testified that Mother and Father still did not have

---

[6] Ultimately, because Father no longer was being considered for custody of S.F., MCCS dropped the request for a parenting psychological examination. (Tr. p. 185-186.)

[7] The record is unclear as to the exact period that Mother was jailed during 2018. However, she was released before Anderson met with her on July 17, 2018. (Tr. p. 180.)

independent housing as of the hearing date; they reported moving between the homes of Maternal Grandmother and Paternal Grandmother. As a result, S.F.'s parents had not completed the case plan's housing objective. While Father reported receiving under $700 per month in disability payments, he declined to obtain a job, and Mother also had no employment. Thus, they had not met the income objective.

{¶ 23} According to Anderson, only in June 2019 did Father complete a substance abuse assessment, as required by the case plan. That assessment recommended that Father receive ongoing counseling and medication management. Aside from receiving Vivitrol, however, Father had not complied with the recommendations. Anderson expressed concerns about Father's ongoing substance abuse, including the incident where he overdosed while on his way to supervised visitation with S.F. She said Father also had tested positive on multiple drug screens. (*See* Tr., State's Exhs. 1, 6.)[8] Anderson considered the case plan regarding substance abuse to be incomplete as to Father, and testified that she did not expect Father to be able to complete his case plan objectives in the foreseeable future. She opined that in the two years since S.F. had entered foster care, "there's been no significant improvement with the parents." (Tr. p. 186.)

{¶ 24} Turning to Mother, Anderson said that she initially referred Mother to resources in Montgomery County, but Mother did not take advantage of any of those resources. When Mother and Father moved to New Vienna, Anderson attempted to find referrals there, but Mother was incarcerated before those resources became available.

---

[8] Laboratory reports admitted into evidence showed that Father tested positive for fentanyl and buprenorphine on August 21, 2018, and for amphetamines, methamphetamines, and fentanyl on December 28, 2018.

Upon her release, Mother did obtain a substance abuse and mental health assessment. Anderson testified that Mother was found to have an opiate use disorder. Despite the assessment's recommendation that she attend individual and group counseling, Mother attended for only about two months before being released by her counselor in December 2018, for failure to actively participate. Anderson said that Mother maintained sobriety while incarcerated and for a short time thereafter, but soon tested positive on a drug screen. (*See* Tr., State's Exh. 2.)[9] According to Anderson, Mother had not completed the recommended ongoing care, had not dealt adequately with her substance abuse issues, had not made adequate progress on her case plan objectives, and was not expected to do so in the foreseeable future.

{¶ 25} Finally, as to visitation, Anderson identified a log maintained by MCCS as to all supervised visits with S.F. from February 28, 2018 through August 30, 2019. (Tr., State's Exh. 9.) According Anderson, because Mother and Father's weekly visits were "very sporadic; either they didn't show or they were late," MCCS imposed a requirement that they arrive an hour ahead of each scheduled visit (Tr. p. 193); only then would MCCS send a vehicle to transport S.F. No visits occurred between January 7, 2019 and June 14, 2019. The log reflects that during that period, Mother and Father failed to appear without calling for five consecutive weeks, from January 15, 2019 to February 12, 2019. MCCS then sent Mother, Father, and Paternal Grandmother a letter instructing them to contact MCCS if they wished to resume visitation. That did not occur until June 14, 2019.

{¶ 26} Beginning on June 14, 2019, both Mother and Father visited S.F. for three

---

[9] A laboratory report admitted into evidence showed that Mother tested positive for cocaine and benzoylecgonine on December 28, 2018.

consecutive weeks. Because they arrived late on July 5, 2019, no visit occurred on that date; however, both attended weekly from July 12, 2019 through August 9, 2019. They missed the August 16 and August 23, 2019 visits, but returned on August 30, 2019. Paternal Grandmother attended visits on only two occasions from June through September 2019. Anderson further noted that Father was asked to leave a scheduled visitation in October 2018 when he showed up "intoxicated." (Tr. p. 203-204.)

{¶ 27} Anderson testified that when MCCS opened S.F.'s case, Paternal Grandmother was the first relative investigated as a possible placement. Later, Father's sister was suggested as a possible custodian for S.F., but was determined not to be a suitable placement. Anderson said Father's sister had an open agency case – "[i]f it was not child neglect, it was something like that." (Tr. p. 204-205.) On her own initiative, Anderson sought out Maternal Grandmother, who told Anderson that no one from Mother's family was able to take custody of S.F.

{¶ 28} As to Paternal Grandmother's suitability, Anderson first expressed concerns related to income; "it's always been a struggle to get proof of income from" Paternal Grandmother. (Tr. p. 206.) Anderson had seen no evidence that Paternal Grandmother was working as of the time of the hearing. Further, only months into the investigation did Anderson learn that the home where Paternal Grandmother lived was shared with T.J., the subject of substantiated allegations of sexual abuse. Anderson said Paternal Grandmother claimed she and T.J. were not living together, but she gave Anderson a series of wrong telephone numbers and addresses for T.J. before Anderson finally was able to locate him in a rooming house. Although T.J. showed her a receipt for rent at the rooming house, Anderson saw "no personal effects at all" in his room, "no food, toiletries,

clothing, nothing to show that he was [living] there." (Tr. p. 211.) Subsequently, Paternal Grandmother advised Anderson that she (Paternal Grandmother) had moved out of the marital home and into a property in Pleasant Plain, Ohio, where she resided at the time of the hearing.

{¶ 29} Although Paternal Grandmother was permitted to have in-home visitation during September 2018, Anderson said the GAL requested that those visits end after S.F. suffered asthma symptoms following each visit. Anderson testified that Paternal Grandmother also failed the home study conducted while she remained in the marital residence. Anderson said the primary reason for that failure was MCCS's inability to establish that T.J. was not living in the home. Anderson said Paternal Grandmother gave "inconsistent statements," including saying she did not know where T.J. was or how to contact him, but also saying that he was paying her living expenses. (Tr. p. 219.) Although Paternal Grandmother no longer lived in the marital residence in February 2019, MCCS continued to have concerns about her lack of income and her lack of healthy boundaries with Mother and Father.[10]

{¶ 30} Anderson testified that S.F. was doing well in his foster home. She stated that he was "very energetic and rambunctious," his asthma was under control, and he appeared to be very bonded with his foster parents, as well as his foster father's mother, who visited often. (Tr. p. 222-223.) Anderson said that MCCS would continue to work with the foster parents toward adopting S.F. Anderson opined that it would be impossible for S.F. to be reunified with Mother and Father within reasonable time limits. Further, she

---

[10] On cross-examination, Anderson explained her boundary issue concerns by stating that Paternal Grandmother is "not able to tell [Father] and [Mother] no." (Tr. p. 254.)

opined that Paternal Grandmother was not bonded with S.F.; she said that Paternal Grandmother had visited him only seven times and was not taking advantage of all opportunities to visit. Anderson stated that on the two occasions she witnessed Paternal Grandmother's visits with S.F., "there was not a lot of interaction." (Tr. p. 250.) Anderson also noted that Paternal Grandmother's lease would not permit S.F. to live in her current apartment along with C.F. and N. Anderson concluded that S.F.'s best interest would be served by granting MCCS permanent custody.

{¶ 31} Finally, Paternal Grandmother appeared as the sole witness opposing MCCS's request for permanent custody. She testified that she had lived in Pleasant Plain since November 2018. However, she stated that she was living in Dayton when she first met with MCCS regarding S.F. in February 2018. Paternal Grandmother said that an MCCS representative initially told her that she (Paternal Grandmother) had passed the home study conducted in February 2018. Only later did she learn that MCCS would not place S.F. with her due to concerns that T.J., her husband, was living in the home. Paternal Grandmother testified that T.J. had moved out of their Dayton marital residence in December 2017,[11] when HCCS advised her that S.F. could not live with her if T.J. were there. She maintained that T.J. did not live with her at any time after MCCS became involved in S.F.'s case. Paternal Grandmother said she had considered divorcing T.J., but currently was spending her funds on the custody matter instead.

{¶ 32} Paternal Grandmother said she had no criminal record. She explained that

---

[11] Later, however, Paternal Grandmother testified that T.J. still lived at the marital residence; "[h]e never left." (Tr. p. 299.) She also acknowledged that the car she drove was registered to T.J. at the marital address, and "guess[ed]" that T.J. paid for the insurance on that car.

she obtained custody of C.F., S.F.'s older brother, in April 2017, through a Clinton County case. She said that although the same county's Sheriff's office had investigated the sexual abuse allegations made against T.J. in 2012, Clinton County Children Services supported her getting legal custody of C.F. after meeting with her and T.J. in 2017. A copy of the custody entry was admitted into evidence. (Tr., Father's Exh. P.)

{¶ 33} Regarding visitation with S.F., Paternal Grandmother said she initially was told that she could not attend the earliest supervised visits, which were limited to Mother and Father. However, she said she later was permitted to accompany Mother and Father to weekly visitation, and during September 2018, visitation occurred in her home. Paternal Grandmother acknowledged that she was a smoker at that time,[12] but denied that anyone smoked inside her home during S.F.'s visits or at any other time. She stated that she did witness S.F. "kinda wheezing" during one visit there, and told MCCS.[13] (Tr. p. 280.) She said that Anderson later "gave [her] a paper" forbidding smoking around S.F.; Paternal Grandmother said she honored that prohibition. (Tr. p. 280-281.)

{¶ 34} Paternal Grandmother testified that S.F.'s visits to her home went well, and that S.F. and his brother C.F. bonded "[i]mmediately." (Tr. p. 282.) She said that she also felt bonded to S.F., and that S.F. had played at her home with another grandchild near his age. Paternal Grandmother said she then was allowed one monthly visitation, which she claimed to attend regularly with one exception, when she had no one to watch N., her infant great-grandchild. She said that N. was placed with her after N.'s mother granted

---

[12] Paternal Grandmother subsequently testified that she quit smoking in 2019 due to S.F.'s health condition. (Tr. p. 292.)

[13] Later, she said that Father, not she, told Anderson of MCCS about the wheezing incident at her home. (Tr. p. 316.)

permission and Greene County conducted an investigation.

{¶ 35} Although Paternal Grandmother acknowledged that her then-current lease did not allow for three children in that apartment, she intimated that her landlord "has no problem with the baby being there." (Tr. p. 285-286.) She also said that she had an appointment to "look at" a three-bedroom townhouse (Tr. p. 286); she said she believed she could afford the rent there of "just a tad over a thousand dollars a month." (Tr. p. 293.) She also identified photographs of her then-current apartment, including one bedroom for C.F. with a crib for S.F. and one bedroom that she shared with N. (Tr., Father's Exhs. B-O.)

{¶ 36} Paternal Grandmother testified that she was employed on weekends at a nursing home in Batavia, Ohio, and also babysat during the week. She estimated her annual income to be $43,000. She expressed confidence that she could provide for herself, C.F., S.F., and N., "[a]s long as I keep babysitting." (Tr. p. 289.)

{¶ 37} Later, however, she acknowledged that she had not yet begun the job in Batavia. (Tr. p. 302.) She said her last previous employment had ended in March 2019, and she had no income during the intervening six months. As to babysitting, she said she had been doing so for "eight weeks, twelve weeks" for her daughter's children, and was being paid $325 per week by her daughter's father. (Tr. p. 315.) However, she acknowledged that she never provided MCCS with any verification of income.

{¶ 38} With regard to the GAL's unannounced visit the previous day, Paternal Grandmother said that she was "[a]t the grocery store, getting something for dinner," and was gone 40 to 45 minutes. She said that in her absence, N.'s other grandmother was watching N. and C.F.; she said another granddaughter of her own was there as well,

along with N.'s mother, Mother, and Father. She maintained that N.'s other grandmother was an appropriate caregiver in her absence, and that no one present was under the influence of drugs or alcohol.

{¶ 39} Paternal Grandmother said that granting her legal custody would be in S.F.'s best interest, because "I've got my love into my favor to get to him." (Tr. p. 290.) She pledged to assure that C.F., S.F. and N. had "[t]he basics and anything else I can give 'em." (*Id.)* She said that she "[n]ever again in my life" planned to have T.J. in her home, and was prepared to "call and have * * * removed" anyone who entered her home while under the influence of drugs or alcohol. (Tr. p. 291.) She also said she would be willing to supervise Mother and Father's visits with S.F., and would not leave him with them without supervision. While Paternal Grandmother indicated that Father "shares a lot with me," she testified that she was not aware of the circumstances of Father's encounter with Dayton police on August 16, 2019. (Tr. p. 318-319.)

{¶ 40} On October 17, 2019, the trial court issued a decision finding "that the State presented clear and convincing evidence that a grant of permanent custody to the agency is in the child's best interest," and that Paternal Grandmother "is not able to adequately care for the child." (Judge's Final Order, p. 10.) Accordingly, the court entered judgment granting permanent custody to MCCS, denying legal custody to Paternal Grandmother, and terminating Mother and Father's parental rights. (*Id.* at p. 11.)

{¶ 41} Father's appeal from the trial court's judgment raises this single assignment of error: "The grant of permanent custody to MCCS was an abuse of discretion as the court did not consider the requirements of OAC 5101:2-42-05 and 5101:2-42-18."

**Standard of Review**

{¶ 42} An appellate court will not reverse a decision regarding permanent or legal custody of a child absent an abuse of discretion by the juvenile court. *See In re K.W.,* 185 Ohio App.3d 629, 2010-Ohio-29, 925 N.E.2d 181, ¶ 15 (2d Dist.) (applying abuse of discretion standard to decision granting permanent custody and terminating parental rights); *In re M.O.,* 2d Dist. Montgomery No. 26457, 2015-Ohio-2430, ¶ 7 (applying abuse of discretion standard to decision granting legal custody). The term "abuse of discretion" implies that the court's decision was unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore,* 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 43} If the juvenile court's determination as to a child's best interest is not supported by competent, credible evidence, that decision is unreasonable, and we may reverse. *In re Starks,* 2d Dist. Darke No. 1646, 2005-Ohio-1912, ¶ 17, citing *In re Nice,* 141 Ohio App.3d 445, 455, 751 N.E.2d 552 (7th Dist.2001). However, "the discretion which a trial court enjoys in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." *Miller v. Miller,* 37 Ohio St.3d 71, 74, 523 N.E.2d 846 (1988). Because "[t]he knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding cannot be conveyed to a reviewing court by a printed record[,] * * * the reviewing court in such proceedings should be guided by the presumption that the trial court's findings were indeed correct." (Citations omitted.) *Id.* Such deference to the trial court's findings "is even more crucial in a child custody case, where there may be much evident in the parties' demeanor and attitude that does *not* translate to the record well." (Emphasis sic.) *Davis v. Flickinger,* 77 Ohio St.3d 415, 419, 674 N.E.2d 1159 (1997).

**Law Governing Permanent and Legal Custody Decisions**

{¶ 44} The United States Supreme Court has stated that a parent's interest in the care, custody, and control of his or her children "is perhaps the oldest of the fundamental liberty interests recognized by" that court. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). Unless they forfeit the right through specific conduct, "suitable" parents have a "paramount" right to the custody of their minor children. *In re Perales*, 52 Ohio St.2d 89, 97, 369 N.E.2d 1047 (1977). Still, "the natural rights of a parent are not absolute, but are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed." (Citation omitted.) *In re Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979).

{¶ 45} Pursuant to R.C. 2151.414(B)(1), a juvenile court may grant permanent custody of a child to a child services agency upon determining that permanent custody is in the child's best interest. Because an award of permanent custody is " 'a drastic remedy' " that "involves the termination of parental rights," permanent custody determinations must be based upon clear and convincing evidence. *In re S.M.*, 2d Dist. Montgomery No. 24539, 2011-Ohio-6710, ¶ 4, fn.1, quoting *In re A.W.*, 2d Dist. Montgomery No. 21309, 2006-Ohio-2103, ¶ 6; *see also* R.C. 2151.414(B)(1) and (E). "Clear and convincing evidence" is " 'the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established.' " *In re Rose*, 2017-Ohio-694, 85 N.E.3d 498, ¶ 19 (2d Dist.), quoting *In re Estate of Haynes*, 25 Ohio St.3d 101, 104, 495 N.E.2d 23 (1986). "Clear and convincing" means "more than a mere preponderance," but less than "clear and unequivocal." *Id.*

{¶ 46} R.C. 2151.414 establishes a two-part test for courts to apply when

determining a motion for permanent custody to a public services agency. First, the court must find by clear and convincing evidence that the child either (a) cannot or should not be placed with either parent within a reasonable period of time; (b) is abandoned; (c) is orphaned and no relatives are able to take permanent custody of the child; or (d) has been in the temporary custody of one or more public or private children services agencies for 12 or more months of a consecutive 22-month period. *In re S.J.,* 2d Dist. Montgomery No. 25550, 2013-Ohio-2935, ¶ 14, citing *In re K.M.,* 8th Dist. Cuyahoga No. 98545, 2012-Ohio-6010, ¶ 8; R.C. 2151.414(B)(1). Second, the court must determine that granting permanent custody to the agency is in the child's best interest. *Id.*

{¶ 47} In determining a child's "best interest" under R.C. 2151.414(B)(1), a court must consider the factors set forth at R.C. 2151.414(D)(1). Those factors include:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two-month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) [Whether additional factors listed at R.C. 2151.414(E)(7)-(11) apply].

R.C. 2151.414(D)(1).

{¶ 48} As an alternative to an award of permanent custody, a juvenile court may award legal custody of a dependent child to a non-parent who asks for legal custody or is proposed as a legal custodian. *In re A.F.*, 2018-Ohio-310, 103 N.E.3d 1260, ¶ 51 (2d Dist.), citing R.C. 2151.353(A)(3). Unlike an award of permanent custody, "[a]n award of legal custody of a child does not divest parents of their residual parental rights, privileges, and responsibilities." *In re C.R.*, 108 Ohio St.3d 369, 2006-Ohio-1191, 843 N.E.2d 1188, paragraph one of the syllabus. Those privileges include reasonable visitation. R.C. 2151.353(A)(3)(c).

{¶ 49} When making a legal custody determination under R.C. 2151.353, the juvenile court must apply the "best interest of the child" standard set forth in R.C. 3109.04(F)(1). *In re A.F* at ¶ 52, citing *In re D.S.*, 2d Dist. Clark No. 2013 CA 51, 2014-Ohio-2444, ¶ 9; *In re Poling*, 64 Ohio St.3d 211, 594 N.E.2d 589 (1992), paragraph two of the syllabus; R.C. 2151.23(F)(1). The "best interest" factors for purposes of legal custody differ somewhat from those for permanent custody determinations, in that considerations for the former include "[t]he wishes of the child's parents regarding the child's care" and "[t]he child's adjustment to the child's home, school, and community." *See* R.C. 2141.23(F)(1)(a), (d).

{¶ 50} Significantly, however, "R.C. 2151.353(A) does not require a juvenile court to consider placing [a] child[ ] with a relative prior to granting the permanent custody request of an agency." *In re A.A.,* 2d Dist. Greene No. 2008 CA 53, 2009-Ohio-2172, ¶ 19. "Relatives seeking the placement of the child are not afforded the same presumptive

rights that a biological parent receives as a matter of law, and the willingness of a relative to care for the child does not alter the statutory factors to be considered in granting permanent custody." *Id.*, citing *In re A.V.*, 4th Dist. Lawrence No. 08CA31, 2009-Ohio-886, ¶ 17. Accordingly, "[c]ourts are not required to favor a relative if, after considering all the factors, it is in the child's best interest for the agency to be granted permanent custody." *Id.*, citing *In re A.V.* at ¶ 17; *In re Wilkenson*, 1st Dist. Hamilton Nos. C-010402, C-010408, 2001 WL 1220026 (Oct. 12, 2001).

### Preliminary Issue – Standing

{¶ 51} We first address the State's suggestion that Father lacks standing to challenge the trial court's denial of the motions to have legal custody assigned to Paternal Grandmother. (*See* Brief of Appellee, p. 12-13.) The State asserts that "a parent may only appeal the termination of parental rights and not the denial of a motion for a third party." (*Id.* at p. 13, citing *In re S.C.*, 2018-Ohio-2523, 115 N.E.3d 813, ¶ 14 (8th Dist.), and *In re K.C.*, 2017-Ohio-8383, 99 N.E.3d 1061, ¶ 8 (1st Dist.).) The cited cases are distinguishable, however, in that Father is appealing from the denial not of a third-party's motion, but of his *own* motion asking that Paternal Grandmother be granted legal custody of S.F. *Compare In re K.C.* at ¶ 11 (finding parent lacked standing to appeal "denial of a *relative's* custody petition") (Emphasis added.).

{¶ 52} Further, we concur in the Eighth District's observation that "[i]f permanent custody to [the agency] is in the child[ ]'s best interest[ ], legal custody to a relative necessarily is not." *In re S.C.* at ¶ 16. Because our review establishes that the trial court did not abuse its discretion by determining that a grant of permanent custody to MCCS was in S.F.'s best interest, we decline to engage in an extensive analysis of the State's

secondary argument regarding standing.

**Father's Assignment of Error**

{¶ 53} Father contends that the trial court erred in granting permanent custody to MCCS without considering the requirements of Ohio Adm.Code 5101:2-42-05 and 5101:2-42-18. Specifically, he argues that MCCS rejected Paternal Grandmother as a suitable placement for S.F. based upon its improper consideration of sexual abuse allegations that occurred "at least six years prior to [S.F.'s] birth," "were never proven in a court of law," and were made against someone (J.T.) purported to have moved from Paternal Grandmother's home even before MCCS began its placement search.

{¶ 54} As an initial matter, we note that the parties have directed us to nothing in the record to indicate that any argument regarding MCCS's alleged non-compliance with the administrative regulations was presented to the trial court. We ordinarily do not consider issues raised for the first time on appeal. *See Tax Ease Ohio, LLC v. Lucas*, 2d Dist. Montgomery No. 27836, 2018-Ohio-3075, ¶ 6, quoting *State v. Schneider*, 2d Dist. Greene No. 95-CA-18, 1995 WL 737910, *1 (Dec. 13, 1995) ("It is settled law that issues raised for the first time on appeal and not having been raised in the trial court are not properly before this court and will not be addressed."). That omission alone might warrant rejecting Father's assignment of error. However, we also conclude that Father's argument is without merit.

{¶ 55} Under Ohio Adm.Code 5101:2-42-05(A), agencies such as MCCS are required to "explore both maternal and paternal relatives" as possible temporary custodians of a child unable to remain in his or her home. Aside from placement with a parent, Ohio Adm.Code 5101:2-42-05(F)(2) assigns the highest preference to

placements in "[t]he home of a suitable relative." Regardless of that preference, Ohio Adm.Code 5101:2-42-18(H) sets forth an extensive list of criminal violations that will preclude approving as a substitute caregiver any person who has "been convicted of or pleaded guilty to" those offenses, or resides with another adult who has.

{¶ 56} Under Ohio Adm.Code 5101:2-42-18(H), mere allegations of criminal conduct are not a proper basis for refusing to place a dependent child with a family member. *See In re A.J.,* 148 Ohio St.3d 218, 2016-Ohio-8196, 69 N.E.3d 733. In *In re A.J.,* the Supreme Court of Ohio considered the appeal of a mother whose parental rights were terminated after a child services agency found a maternal aunt to be an unsuitable substitute caregiver. On appeal, the mother argued that the agency "ignore[d] the mandates of [Ohio Adm.Code] 4101:2-42-05" by refusing to place her child with a relative due to 10-year-old child endangerment allegations against that relative. *Id.* at ¶ 17. The Supreme Court determined "that the plain language of [Ohio Adm.Code 5101:2-42-18] requires proof of a conviction or guilty plea" in order for a relative's criminal history to disqualify him or her from serving as a substitute caregiver. *In re A.J.* at ¶ 21. Father thus is correct in asserting that MCCS should not have denied Paternal Grandmother custody of A.F. based upon the sexual abuse allegations against J.T.

{¶ 57} Nevertheless, the Court in *In re A.J.* found that the agency also denied placement with the maternal aunt due to her lack of income, meaning that the criminal allegations against her "w[ere] not the sole basis for the agency's decision." *Id.* at ¶ 22, 26. The majority affirmed the trial court's judgment awarding permanent custody to the agency, declining to find that the trial court abused its discretion by not finding error in the agency's decision to reject the maternal aunt as a substitute caregiver. *Id.* at ¶ 27.

**{¶ 58}** As in *In re A.J.*, the agency in S.F.'s case found that Paternal Grandmother's lack of income left her unable to provide an appropriate placement. Father's challenge to that finding relies heavily on the dissenting opinion in *In re A.J.* In that opinion, the dissenting justices faulted the majority for "fail[ing] to consider that Ohio Adm.Code 5101:2-42-18 contemplates that a relative may be suitable to care for a child but may require financial or other assistance." *Id.* at ¶ 32 (O'Donnell, J., dissenting). In part because the record "[wa]s silent about whether the agency gave [information about possible resources] to" the maternal aunt, the two dissenting justices said they would reverse the court of appeals, vacate the trial court's permanent custody judgment, and remand for a new placement decision. *Id.* at ¶ 34.

**{¶ 59}** Father argues that a reversal on that basis is warranted in this case. We disagree, for multiple reasons. First, Father cites only that dissenting opinion for the proposition that because MCCS did not prove it provided Paternal Grandmother with information about resources for possible financial and other assistance in accordance with Ohio Adm. Code 5101:2-42-18(B)(4) and (5), the trial court erred by not finding that the agency acted improperly in deeming Paternal Grandmother to be an unsuitable substitute caregiver due to lack of income. The majority in *In re A.J.* held otherwise, stating that "the record indicates that [the maternal aunt's] lack of income excluded her as a relative substitute caregiver." *In re A.J.* at ¶ 26. The record before us likewise demonstrates that Paternal Grandmother did not provide evidence of an income adequate to meet the needs of A.F. in addition to those of the children already in her care.

**{¶ 60}** Second, the dissenting justices in *In re A.J.* based their disagreement with the majority in part on the absence from the record of "information about [the maternal

aunt's] assets or employment history or prospects * * *." *Id.* at ¶ 33. In the opinion of the dissenting justices, the maternal aunt's lack of income at the time of the home study, "standing alone, d[id] not demonstrate [the maternal aunt wa]s unsuitable to care for" the infant child at issue. *Id.* In the instant case, however, the record contains significant information about Paternal Grandmother's lack of stable employment, job opportunities, or documented income over an extended period. In fact, during the custody hearing conducted more than a year after a home study found her to have no verified income, Paternal Grandmother projected that she would have an adequate annual income based only a weekend job that she had not yet begun and a recent arrangement to provide paid childcare for her grandchildren during the week. The record contains clear and convincing evidence to support MCCS's conclusion that Paternal Grandmother lacked sufficient stable income and housing to serve as a suitable placement.

{¶ 61} Finally, under our existing precedent, the juvenile court was not required to consider placing S.F. with Paternal Grandmother prior to granting the agency's permanent custody request. *See In re A.A.*, 2d Dist. Greene No. 2008 CA 53, 2009-Ohio-2172, ¶ 19, citing R.C. 2151.353(A). "[T]he willingness of a relative to care for the child does not alter the statutory factors to be considered in granting permanent custody." *Id.* As stated by the Eighth District Court of Appeals:

> In deciding what is in a child's best interest in a permanent custody proceeding, the trial court need not find by clear and convincing evidence that termination of parental rights is the only option or that no suitable relative is available for placement. * * * Rather, R.C. 2151.414 requires the court to find the best option for the child upon a weighing of all the relevant

factors. * * * "The statute does not make the availability of a placement that would not require a termination of parental rights an all-controlling factor. The statute does not even require the court to weigh that factor more heavily than other factors."

(Citations omitted.) *In re T.H.*, 8th Dist. Cuyahoga No. 107947, 2019-Ohio-3045, ¶ 14. Father's challenge based on the juvenile court's failure to consider whether MCCS fully complied with the requirements of Ohio Adm.Code 5101:2-42-05 and 5101:2-42-18 is not well taken.

{¶ 62} Further, we conclude that clear and convincing evidence supports the trial court's determination that awarding permanent custody to MCCS was in S.F.'s best interest. First, the evidence demonstrates that grounds for permanent custody existed under R.C. 2151.414(B)(1)(a), and Father does not dispute the trial court's finding that S.F. could not be placed with either parent within a reasonable time, or that S.F. had been in agency custody for more than 12 consecutive months. Second, in discerning S.F.'s best interest, the trial court properly considered the appropriate factors under R.C. 2151.414(D)(1). The record substantiates the trial court's finding that two-year-old S.F. was too young to express a placement preference in accordance with R.C. 2151.414(D)(1)(b). Clear and convincing evidence supported a conclusion that the remaining factors all weighed in favor of granting permanent custody to MCCS – i.e., testimony about S.F.'s bonded relationship with his foster family compared to limited and sporadic visits with Mother, Father, and Paternal Grandmother (R.C. 2151.414(D)(1)(a)); S.F.'s presence in agency custody since two months of age and with the same foster family since he was six months old (R.C. 2151.414(D)(1)(c)); S.F.'s need for a legally

secure permanent placement such as what the foster parents had been providing, whereas Mother, Father, and Paternal Grandmother had not convincingly shown they could provide S.F. with secure, stable housing, provide adequate income for his needs, or insulate him from his parents' illegal drug use (R.C. 2151.414(D)(1)(d)); and Mother, Father, and Paternal Grandmother's abandonment of S.F. by repeatedly failing to appear for supervised visitation as scheduled (R.C. 2151.414(D)(1)(e) and (E)(10)).

{¶ 63} Father's assignment of error is overruled.

## Conclusion

{¶ 64} The judgment of the juvenile court will be affirmed.

. . . . . . . . . . . . .

HALL, J. and WELBAUM, J., concur.

Copies sent to:

Mathias H. Heck Jr.
Sarah E. Hutnik
Sara M. Barry
Jessica Andress
M.J.
Serah Siemanm, GAL
Hon. Helen Wallace