**[Cite as *In re K.K.*, 2025-Ohio-4376.]**

**COURT OF APPEALS OF OHIO**

**EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA**

IN RE K.K.

[Appeal by Mother, H.K.]

No. 114809

**JOURNAL ENTRY AND OPINION**

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** September 18, 2025

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD22909433

***Appearances:***

Michael P. Dunham, *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Joseph C. Young, Assistant Prosecuting
Attorney, *for appellee.*

LISA B. FORBES, P.J.:

{¶ 1} H.K. ("Mother") appeals the juvenile court's decision denying her motion to award legal custody of K.K. (or "the Child") to J.C. ("Aunt"), terminating Mother's parental rights, and committing K.K. to the permanent custody of the Cuyahoga County Division of Children and Family Services ("CCDCFS" or "the Agency"). For the following reasons, we affirm the juvenile court's decision.

## I. Facts and Procedural History

{¶ 2} On September 20, 2022, CCDCFS filed a complaint alleging that K.K. was abused, neglected, and dependent and requesting that the Child be committed to the temporary custody of CCDCFS. By journal entry dated January 4, 2023, K.K. was adjudicated dependent and placed in temporary Agency custody.

{¶ 3} Pertinent to this appeal, on April 9, 2024, the Agency filed a motion for permanent custody. Mother moved for legal custody to Aunt.

{¶ 4} The juvenile court initially tried these motions on August 15, 2024, and September 5, 2024, after which the court held the motions in abeyance. In a journal entry dated September 10, 2024, the court ordered, "The proposed legal guardian [Aunt] is to stop all alcohol and Kratom use." The court took further testimony on October 10, 2024, and January 14, 2025.

{¶ 5} The court issued a journal entry dated January 16, 2025, finding clear and convincing evidence that it was in K.K.'s best interest to be placed in permanent Agency custody. The court terminated Mother's parental rights, denied Mother's motion for legal custody to Aunt, and committed K.K. to the permanent custody of CCDCFS.

{¶ 6} From this order, Mother appeals, raising the following assignment of error:

> The Judgment of the Trial Court terminating Mother Ms. H.K. of her parental rights, denying her motion to award legal custody to an interested third party, and, awarding permanent custody to the State was made with insufficient evidence and against the manifest weight of the evidence.

**II. Trial Testimony**

### A. August 15, 2024 Hearing

#### 1. Jenny Lemmer

{¶ 7} Jenny Lemmer ("Lemmer") testified that she was a licensed social worker for a substance abuse assessment facility ("Clinic"). Lemmer stated that, during a substance-abuse assessment, the Clinic's counselors ask patients questions and collect a urine sample to test for drugs. The counselors then recommend treatment plans, if needed. Lemmer reviews substance-abuse assessments and approves or denies recommendations for treatment.

{¶ 8} Lemmer stated that the Clinic assessed Aunt for substance abuse in June 2024. Per Lemmer, Aunt reported past use of drugs including marijuana, benzodiazepines, methamphetamines, oxycodone, crack cocaine, and heroin. Aunt reported that she first used these substances between the ages of 13 and 19 but stopped in 2016. Aunt took prescribed oxycodone again in 2024 after developing kidney stones. Aunt used this prescription "as needed" and "was done with it" when the Clinic assessed her. The Clinic diagnosed Aunt with several substance-use disorders, including mild alcohol-use disorder and severe opioid-use disorder. Lemmer acknowledged the latter condition was in "sustained remission," meaning that Aunt had not used opioids in more than 12 months.

{¶ 9} Following her assessment, Aunt's urine tested positive for nicotine, alcohol, and kratom. Lemmer testified that kratom is a mood-altering substance that has no recognized medical use in the United States. Lemmer further opined

that use of even a legal mood-altering substance "could lead . . . to [Aunt] using other substances that she had struggled with in the past." Lemmer acknowledged that kratom is legal in the United States and can be purchased in leaf-form at "a health food store." Lemmer also admitted that she could not tell, based on Aunt's urine analysis, how much nicotine, alcohol, or kratom Aunt had used in the 72 hours before the Clinic took her urine sample.

### 2. Kimberly Palmer

{¶ 10} Kimberly Palmer ("Palmer") testified that she worked for CCDCFS and had been assigned to K.K.'s case since April 2024. After CCDCFS was granted temporary custody of K.K., the Agency placed the Child with a foster family. Palmer observed K.K. interact with his foster family and described him as "very playful" and "generally pretty happy." Palmer stated K.K.'s foster family included a husband, a wife —Brenda Corchado ("Corchado"), and their children. One of the children was of similar age to K.K.; per Palmer, the children "play[ed] pretty well together." Palmer stated that she observed K.K. interact with every member of his foster household and that the Child appeared to have bonded with them all.

{¶ 11} Palmer testified that K.K. was assessed for autism because he experienced sensory issues and was "clingy" with his caregivers.[1] K.K. received behavioral therapy to help him develop his vocabulary and "manage his behavior if he decides to act out." Palmer stated that Corchado was "very attentive" and "able to comfort" K.K. when he was moody or had a tantrum. During these episodes, K.K.

---

[1] As discussed below, K.K. has since been diagnosed with autism.

listened to Corchado's attempts to "redirect" him to another activity. K.K.'s foster family provided him with a "crash pad" that is "used for children with . . . autism" and that "helps [K.K.] calm down."

{¶ 12} Regarding K.K.'s blood relatives, Palmer testified that Mother was supposed to meet with the Agency monthly but had done so only once between January and July 2024. Palmer testified that during that same period, Mother had not visited K.K. or contacted the Agency to initiate a visit. Per Palmer, Mother had been convicted of drug possession in June 2024 and was on probation.

{¶ 13} Palmer testified that Aunt and her husband ("P.C.") visited with K.K. biweekly until May 2024, when they began to visit the Child weekly. Palmer supervised most of these visits. Per Palmer, it took K.K. "a little while to warm up," although she noted K.K. likes to play independently and that Aunt "did make sure to be attentive and try to interact with him." Palmer also stated that Aunt's home was clean.

{¶ 14} Palmer further testified that, in 2015, CCDCFS had filed a complaint against Aunt regarding her own biological child ("C.K."). In that proceeding, C.K. was adjudicated dependent after Aunt stipulated to several allegations, including substance abuse. C.K. remained in Aunt's custody but was placed under the Agency's protective supervision, which was terminated in 2017.

**B. September 5, 2024 Hearing**

**1. Blaise Freeland**

{¶ 15} Blaise Freeland ("Freeland"), a counselor, assessed Aunt for substance abuse in July 2024. Per Freeland, during their conversation, Aunt shared that she had been sober from opiates for nine years but had tested positive for alcohol and kratom.

{¶ 16} Freeland stated that "[t]here's a lot of conflicting evidence" regarding kratom's effects but acknowledged that it can have opiate-like effects. Freeland admitted that she had not evaluated anyone for kratom dependency before assessing Aunt.

{¶ 17} During her assessment, Aunt described her alcohol and kratom use to Freeland. Freeland stated she did not identify that Aunt's use of these substances was at the time causing legal trouble, conflicts with family and friends, financial strain, or mental or physical health problems. On this basis, Freeland concluded that Aunt's use of alcohol and kratom was not causing "negative consequences" or "an impairment in her life." For this reason, Freeland did not refer Aunt to social services related to substance abuse. Freeland opined that she had no reason to believe Aunt's disclosures were untruthful.

{¶ 18} On cross-examination, Freeland stated that Aunt's prior opiate use had caused "significant impairment in her personal life." Freeland also stated that Aunt reported using suboxone, which curbs opiate cravings and withdrawal symptoms.

### 2. Kelli Severt

{¶ 19} Kelli Severt ("Severt") testified that she had two children with Aunt's now-husband, P.C. P.C. still shares responsibility for his children with Severt. P.C. introduced Aunt to Severt, and they had known each other for eight years. Severt allowed Aunt to care for the children she had with P.C. and sometimes allowed them to stay with Aunt overnight. Severt stated that she trusted Aunt's ability to care for children. Severt was aware of Aunt's past use of alcohol and drugs and had observed her drink alcohol. Severt stated she never observed Aunt's substance use interfere with her ability to care for children.

{¶ 20} On cross-examination, Severt acknowledged that she had only observed Aunt with K.K. "one or two times." Severt also admitted that she was aware that Mother had once overdosed on drugs while watching K.K.'s biological sibling ("K.K.'s Sister"), who was in Agency custody. On that occasion, Aunt had been babysitting K.K.'s Sister and had allowed Mother to watch that child unsupervised, violating her safety plan.

### 3. P.C.

{¶ 21} P.C. testified that he was married to Aunt, with whom he had two children. For the past ten years, P.C. had been employed "on and off" by a restaurant that accommodates his childcare obligations by allowing him to work part time. P.C. testified that he handles household chores including "[l]aundry, dishes, cook[ing], homework, whatever needs to be done." He stated that Aunt and Severt help him care for the children and coordinate their schedules.

{¶ 22} Per P.C., he and Aunt visited with K.K. biweekly beginning in February or March 2024, then began to visit him weekly. P.C. stated that K.K. was "standoffish" during the first few visits, but "after that the visits were amazing." K.K. "warmed up to us really quick." P.C. and Aunt brought their two children to visit with K.K., and "they were just . . . peas in a pod."

{¶ 23} P.C. stated that he had seen Aunt drink alcohol, at most once per week. Aunt's alcohol consumption "never really exceed[ed] two drinks," which was the number required for her to become intoxicated. P.C. described Aunt's intoxication as "really laughy, talking, just reminiscing and enjoying our time together on the couch." P.C. had not "seen her like throwing up or falling on the ground . . . ." P.C. knew Aunt took medication for anxiety or to sleep but did not know what type. He had not known what kratom was before Aunt tested positive for it. P.C. was also aware of Aunt's past substance abuse but had not observed substances affect her ability to care for children.

### 4. Aunt

{¶ 24} Aunt testified that she lived in a house with P.C. and their two children, where P.C.'s two children with Severt also lived part time. Per Aunt, the house was furnished and the utilities were functioning. Everyone that lived in the house had their own bed, and children's books and toys were available.

{¶ 25} Aunt stated that she worked full time as a customer-relations manager and that P.C. worked part time for a restaurant. From these jobs, Aunt and

P.C. earned a monthly household income between $7,000 and $7,500. With this income, Aunt and P.C. had no issues meeting their family's basic needs.

{¶ 26} Aunt stated that she and P.C. visited with K.K. for "eight or nine months," beginning in January 2024. Aunt and P.C. attended these visits consistently. Aunt described their visits with K.K. as "wonderful." K.K. was "closed-off" at first, but his relationship with Aunt, P.C., and their two children "blossomed."

{¶ 27} Aunt stated that, to prepare for the possibility that she would be granted legal custody of K.K, she had contacted "a handful of programs" that offer daycare and early learning services. Aunt did not know whether these programs offered specialized services for children with autism.

{¶ 28} Aunt admitted that her own biological child, C.K., had been adjudicated dependent and placed under protective supervision because of her past opiate use. Because Aunt complied with C.K.'s case plan, protective supervision was terminated. Aunt also admitted that, while babysitting K.K.'s Sister in 2020, she allowed Mother to watch that child unsupervised, which violated that child's safety plan. While alone with K.K.'s Sister, Mother overdosed on drugs.

{¶ 29} On cross-examination, Aunt admitted using to alcohol and kratom. Aunt denied knowing that kratom had "opiate-like effects," but acknowledged that the substance did not have a recognized medical use in the United States. Aunt stated that she purchased kratom at a gas station and that it is marketed as a "plant-based herbal supplement." Aunt stated that she did not intend to keep using kratom but believed that continuing to consume alcohol was not an issue.

{¶ 30} Aunt acknowledged using opiates from 2013 to 2016, during which time she used heroin and oxycodone regularly. Aunt stated that taking legal custody of K.K. would require her to interact with Mother, with whom she had consumed illegal drugs "probably twice" in the past. Aunt explained that she had gone through drug treatment and that her "triggers" no longer make her "want to go use." Per Aunt, she first began using drugs to manage pain from an ovarian cyst.

{¶ 31} In response to the court's questions, Aunt stated that she does not contact Mother unless Mother reaches out in need of something. Per Aunt, Mother resides with their father — K.K.'s grandfather, with whom Aunt has "not a great" relationship. Aunt stated that if she were granted legal custody of K.K., all of the Child's future visits with Mother would be supervised.

{¶ 32} Aunt also described how she began to use kratom. Following her opioid addiction, Aunt was prescribed suboxone, which she used for more than four years. Aunt stopped using suboxone when her insurance no longer covered it. After "coming off . . . suboxone," Aunt "had no energy." Aunt read online about an energy supplement called "Feel Free," a liquid that contains kratom. Aunt described its effects as "like a cup of coffee" that "helped [her] focus." Aunt did not know that Feel Free contained kratom when she began using it. She agreed that she would stop taking kratom if the court instructed her to.

{¶ 33} At the close of testimony on September 5, 2024, the court instructed Aunt, "Stop with the kratom. Okay?"

### 5. Corchado

{¶ 34} Corchado testified that she was K.K.'s foster mother. Corchado resided with her husband, her two biological children, and K.K. Per Corchado, nobody that resided in the home had past issues with crime or substance abuse. Corchado stated that K.K. had bonded with the members of her immediate household, particularly her biological son.

{¶ 35} Also residing in Corchado's home was another foster child, a three-year-old girl who has been diagnosed with autism. By caring for this girl, Corchado has become "very familiar" with autism. She had "done all of the treatments with [the foster child]" and "worked with her caregivers." Corchado "did a lot of . . . research" and has "taken additional training" related to caring for autistic children.

{¶ 36} Per Corchado, at the time of her testimony, K.K. had resided with her family for six months. Corchado described him as "a great kid," but stated she had observed that he had "a lot of behavioral and social communication deficits." K.K. would have "frequent tantrums," which could be "triggered by minor things" and lasted between "15 to 20 minutes." Corchado stated that the "crash pad" located in K.K.'s room helped him regulate sensory issues.

{¶ 37} Corchado testified that K.K. was evaluated by a licensed psychiatrist on August 28, 2024, and was diagnosed as "mild-moderately autistic." The psychiatrist had recommended 20 to 40 hours of weekly applied behavioral health therapy. Per Corchado, some of the symptoms of autism that K.K. exhibits, including repetitive behaviors, are not necessarily observable during brief visits.

{¶ 38} On cross-examination, Corchado admitted that K.K. lived with her family on and off from March 2024 until CCDCFS placed him with the family full time in July 2024. Corchado agreed that structure and routine are important to managing autism, which switching between homes would not have provided. Corchado also testified that the other foster child that lived in the home was severely autistic, nonverbal, and had frequent tantrums. Corchado believed that her family was equipped to care for multiple autistic children.

{¶ 39} Corchado stated that her family had a good relationship with the foster family in custody of K.K.'s Sister. She testified that, if possible, she would continue to facilitate a relationship between K.K. and his biological sibling, as well as between K.K., Aunt, and P.C.

### 6. Michael Telep

{¶ 40} Michael Telep ("Telep") testified that he was the guardian ad litem ("GAL") for K.K. Per Telep, K.K. has "some severe needs" that he was not sure Aunt was prepared to handle. Telep was also concerned that Aunt was maintaining contact with Mother. On this basis, Telep recommended that Mother's motion for legal custody to Aunt be denied.

## C. October 10, 2024 Hearing

### 1. Corchado

{¶ 41} K.K.'s foster mother testified for a second time, stating that a specialist had recommended that K.K. undergo 35 hours of weekly therapy, focusing on behavior management and emotional regulation. Corchado testified that she had

shared K.K.'s therapy schedule with P.C. and Aunt, but that neither one had attended K.K.'s appointments.

{¶ 42} Before visits with P.C. and Aunt, K.K. was "[v]ery resistant to leaving" his foster home and was "very clingy" with Corchado. The Agency introduced audio and video that Corchado recorded of the Child leaving the foster home. In these clips, K.K. cried and said, "no" and "I'm scared." Corchado also claimed that K.K. had begun to charge at other people and that his physical aggression was more intense after he had visited P.C. and Aunt.

{¶ 43} On cross-examination, Corchado admitted that K.K. resisted activities other than visiting Aunt and P.C., including using the bathroom. Corchado also admitted that K.K. had been more physically aggressive than usual during and after certain appointments, not just after visits with P.C. and Aunt.

### 2. Palmer

{¶ 44} K.K.'s CCDCFS caseworker testified for a second time, stating that K.K. was "very bonded to the [foster] family" and "seems generally pretty happy whenever I . . . come to the [foster] home for a visit."

{¶ 45} Palmer had observed K.K. resist being driven to visit Aunt and P.C. Per Palmer, on this occasion, K.K. said he did not want to visit, "kept running away" from the car, and would not "sit down completely" to be belted into his seat.

{¶ 46} Palmer stated that the Agency suspected that Aunt, against the Agency's instructions, had taken K.K. to see Mother. Palmer believed that this visit occurred at the house where Mother lived with K.K.'s grandparents.

{¶ 47} Palmer also stated that Aunt had tested positive for kratom on September 19, and September 24, 2024.

### 3. K.S.

{¶ 48} K.S. testified that she is K.K.'s grandmother ("Grandmother"). Grandmother stated that when K.K. visited her home, Mother was in Florida and, therefore, had not seen the Child.

### 4. Kenny Kinder

{¶ 49} Kenny Kinder ("Kinder") testified that he was a social worker for the Cuyahoga County Public Defender's office. Kinder had observed K.K. with Aunt and P.C. for a visit that lasted two hours. Per Kinder, K.K. "was really happy where he was" and was "attached to all of" the members of Aunt's household. K.K. spent the visit "playing with the other two kids in the home." "Whatever [the children] did, they did it together." The house had video games, balls, books, Legos, and train sets for the children to play with.

{¶ 50} Kinder did not observe K.K. act aggressively, throw tantrums, or resist Aunt and P.C. Kinder stated that, although Aunt and P.C. had not been formally trained in caring for an autistic child, they were "very attentive to [K.K.'s] needs."

{¶ 51} On cross-examination, Kinder admitted that he had not observed K.K. at appointments or with other caregivers, including his foster family.

### 5. Aunt

{¶ 52} Aunt testified for a second time, stating that she had begun a formal training on caring for autistic children.

{¶ 53} Aunt also stated that her family had moved to a larger home. Per Aunt, her family's relocation was the reason K.K. had recently resisted visiting them. "[M]y house went from a . . . nice warm home, to a . . . box-stacked house" with no toys, and "that's when [K.K.'s resistance to visiting Aunt] started to happen."

{¶ 54} On cross-examination, Aunt stated that her training covered redirecting autistic children during tantrums. Aunt believed that her job flexibility and P.C. and Severt's help would allow K.K. to attend 35 hours of behavioral therapy, if he were placed in her legal custody.

{¶ 55} Aunt also stated that, although Corchado had informed Aunt of K.K.'s therapy schedule, Corchado had not invited Aunt to attend appointments, which was the reason Aunt had not come. Aunt nonetheless texted Corchado for updates regarding K.K.'s appointments.

### 6. Telep

{¶ 56} GAL for K.K. again recommended the Child be placed in the Agency's permanent custody, where he would remain with Corchado. Telep noted that Aunt's visits with K.K. had been brief, while Corchado otherwise cared for the Child. For this reason, in Telep's view, Corchado had better experience handling K.K.'s unique developmental needs.

**D. January 14, 2025 Hearing**

    **1. Kelly Mueller**

{¶ 57} Kelly Mueller ("Mueller") testified that she is a pediatric occupational-therapy assistant and that K.K. had been her patient. Mueller observed K.K. with both Corchado and Aunt, each of whom had attended most of Mueller's sessions with the Child. Mueller stated she had not observed anything that made her concerned about Aunt's ability to care for K.K.'s special needs, although she had mostly worked with the Child one on one.

{¶ 58} Mueller stated that K.K. has trouble with "transitions," i.e., ending one activity and beginning another. She also noted that K.K. transitioned between activities more smoothly during one session to which Aunt alone brought the Child. Per Mueller, K.K.'s aggressive behavior had improved over the course of her sessions with him.

    **2. Corchado**

{¶ 59} K.K.'s foster mother testified for a third time, stating that K.K. had "been [doing] really good" in her home. K.K. had started preschool, so "a lot of . . . routine [was] kicking in for him . . . ." Per Corchado, K.K.'s bond with the foster family was "just so good," especially with Corchado's biological son. "We love him and he loves us."

{¶ 60} Although K.K.'s Sister lived 45 minutes away with a different foster family, Corchado had maintained contact between the children. K.K.'s Sister attended a surprise birthday party for K.K. and "they had a blast running around,"

although Corchado acknowledged that both siblings "started crying" when they had to say goodbye to each other.

{¶ 61} Corchado stated that K.K.'s appointments were "up and down" and frequently included tantrums. Aunt was present for K.K.'s tantrums; but, Corchado claimed that she, rather than Aunt, calmed K.K. down.

{¶ 62} K.K. also began to spend nights at Aunt's home. Per Corchado, upon returning from these overnight stays, K.K. was "hypersensitiv[e] from the moment he walk[ed] in the door," behaving "a little bit more impulsive, less predictable." K.K. also became clingier and had bitten himself, which was a new behavior.

### 3. Palmer

{¶ 63} K.K.'s Agency caseworker testified for a third time, stating that she was not aware of Mother engaging with K.K. or completing her case-plan objectives since the previous hearing.

{¶ 64} Palmer stated that K.K. had a "very good bond" with Corchado and her family, who do "very well" redirecting him during tantrums. Palmer had observed K.K. visit with Aunt and her family, too. "He was very . . . excited to play with" Aunt's family.

{¶ 65} Palmer testified that Aunt had tested positive for kratom on October 29, November 7, and November 25, 2024. Aunt did not complete all the drug screens that the Agency had requested. Palmer stated that the Agency requests screens randomly, giving people 24 hours to complete them. Per Palmer, Aunt did not complete some screens that purportedly conflicted with her work schedule.

### 4. Adrionna Barrett

{¶ 66} Adrionna Barrett ("Barrett") testified that she works for CCDCFS and requested drug screens for the Agency. Per Barrett, these screens were scheduled randomly so that participants could not "clean their system out" or "obtain fake urine" before testing. Barrett stated that she had initiated screens for Aunt approximately three times per month over a seven-month span. She could remember only one time that Aunt did not attend a drug screen, purportedly because of a work conflict. Aunt followed up several days later to make up the missed screen.

### 5. Aunt

{¶ 67} Aunt testified for a third time and agreed that she had not attended one of the drug screens that the Agency had arranged. Per Aunt, the Agency sent this request at 9 a.m. on a Friday when she was already at work. The next day, the drug screening facility was only open from 10 a.m. until 1 p.m. Aunt was scheduled to work from 9 a.m. until 5 p.m. that day. For this reason, Aunt told the Agency she could not perform a drug test within the requested 24-hour timeframe. Aunt "followed up on Monday" with the Agency and was then tested.

{¶ 68} Aunt stated that her overnights with K.K. were "going wonderfully." Per Aunt, the time and length of his tantrums had decreased. "He ha[d] built a . . . strong relationship with" both of Aunt's children. Aunt stated that K.K. slept well in her home.

{¶ 69} Aunt said she "was trying to educate [herself] on autism" because she just "want[ed] [K.K.] to thrive." Aunt stated that she had attended all but one of K.K.'s speech-therapy, physical-therapy, and occupational-therapy appointments.

{¶ 70} Aunt stated that she had continued to use kratom, even though she was aware that the court had ordered her not to. Per Aunt, "I cut back and . . . tried other things," including energy drinks, but "life got busy," so she "started taking [kratom] again more often." Without it, "I'm just not getting the energy that I need for my busy life . . . ." Aunt compared the effect of kratom on her to a cup of coffee. She estimated that she consumed "Feel Free" supplements, which include kratom, every two to three days.

### 6. Telep

{¶ 71} GAL for the child reiterated his recommendation that K.K. be placed in Corchado's permanent custody because, in his view, she was better equipped to care for an autistic child. GAL also felt that K.K.'s bond with Corchado was stronger than his bond with Aunt.

{¶ 72} On cross-examination, Telep admitted that he had not observed K.K. during therapy or at school, nor had he spoken to the Child's therapists or teachers. Telep's information regarding K.K.'s therapy and education came primarily from Corchado. Telep also admitted that he had observed the Child's emotional outbursts with both Aunt and Corchado.

### III. Law and Analysis

{¶ 73} In her sole assignment of error, Mother asserts that the record included insufficient evidence to support denying her motion for legal custody to Aunt, terminating Mother's parental rights, and placing K.K. in permanent Agency custody. Mother also asserts that doing so was against the manifest weight of the evidence. Mother argues that the court instead should have granted Aunt legal custody. We disagree.

{¶ 74} Although the terms "sufficiency" and "weight" of the evidence are "quantitatively and qualitatively different," we address these issues together in this case, while applying distinct standards of review, because they are closely related. *See State v. Perry*, 2018-Ohio-487, ¶ 10 (8th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

{¶ 75} "A claim of insufficient evidence raises the question whether the evidence is legally sufficient to support the verdict as a matter of law." *State v. Parker*, 2022-Ohio-1237, ¶ 7 (8th Dist.), citing *Thompkins* at 386. When making a sufficiency determination, an appellate court does not review whether the State's evidence is to be believed but whether, if believed, the evidence admitted at trial supports the verdict. *State v. Starks*, 2009-Ohio-3375, ¶ 25 (8th Dist.), citing *Thompkins* at 386.

{¶ 76} In contrast to sufficiency, a manifest-weight-of-the-evidence challenge "addresses the evidence's effect of inducing belief," i.e., "whose evidence is more persuasive — the state's or the defendant's?" *State v. Wilson*, 2007-Ohio-

2202, ¶ 25, citing *Thompkins* at 386-387.  When considering an appellant's claim that a conviction is against the manifest weight of the evidence, the Ohio Supreme Court recently explained, "sitting as the 'thirteenth juror,' [the] court looks at the entire record and '"weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered,"'" *State v. Brown*, 2025-Ohio-2804, ¶ 30, quoting *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983).  Reversal on manifest-weight grounds is reserved for the "'exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins*, 78 Ohio St.3d at 387, quoting *Martin* at 172.

{¶ 77} A juvenile court may grant a movant permanent custody of a child if the court finds, at hearing, by clear and convincing evidence, that permanent custody is in the child's best interest and any of the factors listed in R.C. 2151.414(B)(1)(a) through (e) applies.  R.C. 2151.414(B)(1), *see also In re D.H.*, 2024-Ohio-748, ¶ 13 (8th Dist.), citing *In re Z.C.*, 2023-Ohio-4703, ¶ 7.

{¶ 78} The Ohio Supreme Court has described the clear-and-convincing evidence standard as follows:

> "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established."

*In re Z.C.* at ¶ 7, quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

### A. R.C. 2151.414(B)(1)(a)-(e) Factors

{¶ 79} In its journal entry granting the Agency permanent custody, the juvenile court found by clear and convincing evidence that K.K. had been in temporary agency custody "for twelve or more months of a consecutive twenty-two month period." We agree.

{¶ 80} When ruling on a motion for permanent custody, a juvenile court considers whether a "child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period . . . ." R.C. 2151.414(B)(1)(d). "Only one of the [R.C. 2151.414(B)(1)] factors must be present for the first prong of the permanent custody analysis to be satisfied." *In re S.C.*, 2018-Ohio-2523, ¶ 20 (8th Dist.), quoting *In re L.W.*, 2017-Ohio-657, ¶ 28 (8th Dist.).

{¶ 81} K.K. was adjudicated dependent and placed in temporary Agency custody on January 4, 2023. At issue in this appeal is the juvenile court's ruling on the Agency's motion for permanent custody that the Agency filed on April 9, 2024. The parties do not dispute that K.K. remained in Agency custody between these dates, during which time 15 consecutive months elapsed. While R.C. 2141.414(B)(1)(d) considers whether a child has been in custody for 12 months of a consecutive 22-month period, "nothing in the plain language of the statute requires a public agency to wait until a child has been in its custody for twenty-two months

before filing a motion for permanent custody." *In re T.R.*, 2025-Ohio-2531, ¶ 34 (8th Dist.), citing *In re N.M.P.*, 2020-Ohio-1458, ¶ 23. The court therefore properly found that K.K. had been in temporary agency custody for 12 months of a consecutive 22-month period under R.C. 2151.414(B)(1)(d), which supports permanent custody to the Agency.

## B. R.C. 2151.414(D)(1) Best-Interest Factors

{¶ 82} R.C. 2151.414(D)(1) requires, in determining the best interests of the child, that juvenile courts

> consider all relevant factors, including, but not limited to: (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child; (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state; (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 83} When analyzing whether terminating parental rights or permanent custody to the Agency is in the best interest of the child, "[t]here is not one element that is given greater weight than the others pursuant to the statute." *In re Schaefer*,

2006-Ohio-5513, ¶ 56. "This court has stated that only one of the enumerated factors needs to be resolved in favor of the award of permanent custody." *In re S.C.*, 2015-Ohio-2410, ¶ 30 (8th Dist.). "R.C. 2151.414(D)(1) does not require a juvenile court to expressly discuss each of the best interest factors in R.C. 2151.414(D)(1)(a) through (e). Consideration is all the statute requires." *In re A.M.*, 2020-Ohio-5102, ¶ 31.

{¶ 84} Regarding Mother's motion for custody to Aunt, we note that "'[c]ourts are not required to favor a relative if, after considering all the factors, it is in the child's best interest for the agency to be granted permanent custody.'" *In re C.T.*, 2021-Ohio-2274, ¶ 79 (8th Dist.), citing *In re S.F.*, 2020-Ohio-693, ¶ 50 (2d Dist.), quoting *In re A.A.*, 2009-Ohio-2172, ¶ 19 (2d Dist.). "A juvenile court need not find, by clear and convincing evidence, that a relative is an unsuitable placement option prior to granting an agency's motion for permanent custody." *In re I.S.-S.*, 2021-Ohio-1720, ¶ 27 (8th Dist.), citing *In re B.D.*, 2008-Ohio-6273, ¶ 29 (4th Dist.).

{¶ 85} The trial court found clear and convincing evidence that it was in K.K.'s best interest to be placed in permanent custody to the Agency. In its January 16, 2025 entry, the court expressly considered each of the "best interests" factors under R.C. 2151.414(D)(1)(a) through (e), finding that they all weighed in favor of temporary agency custody. We agree.

{¶ 86} Regarding R.C. 2151.414(D)(1)(a) — the interaction and interrelationship of the Child with parents, siblings, relatives, foster caregivers, out-of-home providers, and other persons significantly affecting the child — clear and

convincing evidence supported permanent agency custody. K.K.'s caseworker, Palmer, testified that Mother was supposed to meet with the Agency monthly but had done so only once between January and July 2024. Palmer testified that during that same period, Mother had not visited K.K. or contacted the Agency to initiate a visit.

{¶ 87} Further supporting an award of permanent agency custody is the evidence that Corchado was best equipped to handle K.K.'s significant developmental needs. K.K. had been diagnosed as "mild-moderately autistic," which caused K.K. to have frequent tantrums and sensory regulation issues. As a result, the Child's care providers recommended 35 hours of speech-therapy, physical-therapy, and occupational-therapy appointments. Corchado was "very familiar" with autism because she cared for another autistic foster child. Corchado testified that she had "done all of the treatments with [the foster child]" and "worked with her caregivers." Corchado "did a lot of . . . research" and has "taken additional training" related to caring for autistic children. We commend Aunt for undertaking training, too. However, Aunt's training was ongoing at the time of trial. Corchado's training and experience as a caregiver for another autistic foster child makes her better suited to handle K.K.'s developmental needs.

{¶ 88} In addition, the record includes evidence that moving K.K. from his foster home to reside with Aunt would be uniquely difficult. Mueller — K.K.'s pediatric occupational therapy assistant — testified that K.K.'s autism causes him issues with "transitions," i.e., changes. Audiovisual exhibits and testimony

demonstrated that K.K. was "clingy" with his caregivers and that he became especially upset while coming and going between Aunt's and Corchado's homes. By the end of this trial, K.K. had resided with Corchado for more than nine months. Granting the Agency permanent custody of K.K. avoided disrupting the Child's living arrangements, which supports the court's decision that doing so was in his best interests.

{¶ 89} The wishes of the Child, as expressed through the child's GAL, also weighed in favor of permanent agency custody. "The juvenile court properly considers the GAL's recommendation on the permanent-custody motion as part of the R.C. 2141.313(D)(1)(b) analysis where the children are too young to express their wishes." *In re I.A.-W.*, 2022-Ohio-1766, ¶ 37 (8th Dist.), citing *In re B/K Children*, 2020-Ohio-1095, ¶ 45 (1st Dist.). Telep noted in his report that K.K., who was three years old at the end of this trial, was too young to express his views. K.K.'s GAL testified three times, recommending permanent agency custody each time. The GAL testified that, in his view, Corchado was better equipped than Aunt to handle K.K.'s significant developmental needs. The GAL also stated that he believed that K.K. demonstrated a stronger bond with his foster family than with Aunt's family.

{¶ 90} The Child's custodial history also weighs in favor of permanent agency custody. As stated above, by the end of this trial, the Child had been in CCDCFS's uninterrupted temporary custody for more than two years and for 15 months from the Agency's motion for permanent custody.

{¶ 91} The record also includes clear and convincing evidence supporting permanent agency custody regarding the Child's need for legally secure permanent placement and whether that type of placement could be achieved without granting permanent custody. The court was required to grant permanent custody in this case because, by the end of the trial on January 14, 2025, K.K. had been in temporary agency custody since January 4, 2023, for more than two years. R.C. 2151.415(D)(4) prevents a court from ordering temporary custody to continue beyond two years after the date on which the complaint was filed.

{¶ 92} Further, Aunt's past substance abuse and ongoing use of kratom – despite the court's order that she stop doing so – supports a finding that permanent Agency custody offered K.K. the best likelihood of legally secure permanent placement. Social worker Lemmer, who assessed Aunt for substance abuse, concluded that Aunt had mild alcohol-use disorder and severe opioid-use disorder. This diagnosis was based on Aunt's own description of her past drug use. Between the ages of 13 and 19, Aunt used drugs including marijuana, benzodiazepines, methamphetamines, oxycodone, crack cocaine, and heroin. Lemmer believed that Aunt's opioid use was in "sustained remission," i.e., that Mother had not used opioids in more than 12 months. We applaud Aunt for this achievement.

{¶ 93} However, the record demonstrates that Aunt used kratom throughout trial. Though the substance is legal, Freeland, who also assessed Aunt for substance abuse, agreed that kratom can have "opiate-like effects." Lemmer testified that kratom is a mood-altering substance. Per Lemmer, use of mood-altering substances

"could lead . . . to [Aunt] using other substances that she had struggled with in the past." After the September 5, 2024 hearing, the court ordered Aunt to stop using alcohol and kratom. Per Palmer, K.K.'s CCDCFS caseworker, Aunt nonetheless tested positive for kratom in September, October, and November 2024.

{¶ 94} Finally, under R.C. 2151.414(D)(1)(e), the court considered the additional "factors in divisions (E)(7) to (11) of this section," finding that "(E)(10) and (11) apply." Clear and convincing evidence supported the court's determination, under R.C. 2151.414(E)(10) that Mother "abandoned the child." "[A] child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact after that period of ninety days." R.C. 2151.011(C). Again, the evidence, including Palmer's testimony, demonstrated that throughout 2024, Mother failed to meet with the Agency, had not visited K.K, or contacted the Agency to initiate a visit.

{¶ 95} The record also supports the court's conclusion, under R.C. 2151.414(E)(11), that Mother had parental rights involuntarily terminated with respect to a sibling of K.K. and failed to provide clear and convincing evidence that she nonetheless could provide K.K. secure permanent placement and adequate care. K.K.'s Sister was committed to permanent agency custody in 2024 and lived with a nearby foster family. Further, Mother provided no evidence that she could provide K.K. secure permanent placement and adequate care; instead, she requested that K.K. be committed to Aunt's custody. Having found clear and convincing evidence

regarding each of the R.C. 2151.414(D)(1) "best interests" factors, we find that sufficient evidence supported the court's decision granting CCDCFS permanent custody of K.K.

{¶ 96} Regarding Mother's claim that the court's award of permanent agency custody contradicted the manifest weight of the evidence, we note that Ohio courts consistently hold that the factfinder is "in the best position to assess the credibility of the witnesses who testified at trial" and is free to believe all, part or none of each witness' testimony. *State v. Jones*, 2020-Ohio-3367, ¶ 85 (8th Dist.). At trial, the finder of fact is in the "best position to view the witnesses and observe their demeanor, gestures, and voice inflections that are critical observations in determining the credibility of a witness and his or her testimony." *State v. Sheline*, 2019-Ohio-528, ¶ 100 (8th Dist.). Mother raises no issues regarding witness credibility, and we identify none. As a result, given our above discussion of the evidence, we cannot say the juvenile court clearly lost its way by granting the Agency permanent custody of K.K. Therefore, the court's decision was not against the manifest weight of the evidence.

{¶ 97} Accordingly, Mother's sole assignment of error is overruled.

{¶ 98} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

LISA B. FORBES, PRESIDING JUDGE

EILEEN T. GALLAGHER, J., and
KATHLEEN ANN KEOUGH, J., CONCUR