# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

IN RE: S.P. and D.P.        :      APPEAL NO.    C-250641
                                       TRIAL NO.      F/01/2714 Z

                                     :

                                     :      JUDGMENT ENTRY

This cause was heard upon the appeal, the record, and the briefs.

For the reasons set forth in the Opinion filed this date, the judgment of the trial court is affirmed.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs be taxed under App.R. 24.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.

**To the clerk:**

**Enter upon the journal of the court on 3/11/2026 per order of the court.**

**By:**_____
         **Administrative Judge**

[Cite as *In re S.P.*, 2026-Ohio-815.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | | |
|---|---|---|---|
| IN RE: S.P. and D.P. | : | APPEAL NO. | C-250641 |
| | | TRIAL NO. | F/01/2714 Z |
| | : | | |
| | : | *O P I N I O N* | |

Appeal From: Hamilton County Juvenile Court

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: March 11, 2026

*Connie Pillich*, Hamilton County Prosecuting Attorney, and *Patsy A. Bradbury*, Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services,

*Raymond T. Faller*, Hamilton County Public Defender, and *Alexandria Doty*, Assistant Public Defender, for Appellee Guardian ad Litem for the minor children,

*Cynthia S. Daugherty*, for Appellant Mother.

**MOORE, Judge.**

{¶1} After the Hamilton County Juvenile Court adjudicated S.P., D.P., and another sibling who is not the subject of this appeal dependent in September 2017, they were remanded to Mother's custody under protective supervision based on the juvenile court's finding that, at that time, the children were not at risk of harm while in Mother's care. The protective-supervision order, however, was terminated in September 2018 due to allegations that Mother had no working utilities in her home.

{¶2} In May 2019, an adult sister of the children petitioned for custody. A June 11, 2019 entry reflected that the Hamilton County Department of Job and Family Services ("HCJFS") had petitioned for emergency custody of the children and was again involved with the family based on the sister's testimony and the juvenile court's report to 241-KIDS that the children were living in "conditions that put their health at immediate risk."

{¶3} At the hearing on the motion, the sister testified that Mother's home lacked utilities, it was condemned, and the front door did not lock. The magistrate granted interim custody of the children to the sister.

{¶4} On January 14, 2021, the juvenile court granted custody of S.P. and D.P. to their sister because Mother's housing situation had not changed since the children were originally placed with their sister. Mother filed a motion for custody of the children in November 2021. An August 2021 entry, however, reflected that her housing situation remained unchanged.

{¶5} The children were eventually removed from their sister's care due to allegations of abuse and dependency. She ultimately was unable to resume custody due to her subsequent incarceration on an unrelated criminal matter. The children were again placed in the temporary custody of HCJFS and eventually committed to

the agency's permanent custody based on both parents' failure to engage in or substantially complete case-plan services.

{¶6} Only Mother appeals the juvenile court's judgment granting HCJFS permanent custody of the children, arguing that the juvenile court erred in granting HCJFS's motion for permanent custody. She asserts that the court's findings that (1) the children could not be placed with either parent within a reasonable time or should not be placed with either parent, and (2) permanent custody was in the children's best interest under R.C. 2151.414(D)(1) were not supported by clear and convincing evidence and were against the manifest weight of the evidence. For the reasons stated herein, we affirm the juvenile court's judgment.

## I. Factual and Procedural History

{¶7} On December 9, 2021, HCJFS was granted a telephonic ex parte order of emergency custody of S.P. and D.P. after receiving a report that the sister had physically abused S.P.

{¶8} HCJFS also filed a complaint seeking temporary custody of S.P. and D.P. on that same day, alleging that both children were abused, neglected, and dependent. According to the affidavit supporting the complaint, the sister had beaten S.P. with a belt, which left marks and bruises on her and a hemorrhage in her left eye, and caused her pain when she sat. The affidavit stated that the children "have [a] lengthy history involving JFS dating back to 2014 due to medical and educational neglect," and that Father was incarcerated.

{¶9} The affidavit further alleged that Mother was diagnosed with narcissistic personality disorder, had a history of educational and medical neglect of the children, and had refused to sign a release of information ("ROI") or engage in services.

4

{¶10} The magistrate granted HCJFS interim custody of S.P. and D.P., and the children were placed in a foster home. Mother disagreed with the magistrate's order and asserted that the children should have been placed with her.

{¶11} On March 22, 2022, Father, having been released from incarceration, filed a petition for custody of S.P. and D.P.

### A. The Case Plan

{¶12} The case plan, filed on May 16, 2022, required Mother's visits with the children to be supervised due to concerns with Mother's mental health and instability. Mother and Father were expected to monitor what and who the children were exposed to and not allow those who presented a threat to have access to the children, and to identify and remove the children from unsafe environments.

{¶13} The case plan stated that Mother had neither seen the children since December 2020 nor met with the caseworker. The case plan further reflected that Mother had refused to sign an ROI to continue visits with the children at an appropriate agency.

### B. HCJFS Dismisses and Refiles Its Complaint for Temporary Custody

{¶14} On April 19, 2022, HCJFS dismissed its complaint without prejudice and refiled its motion for interim custody, supporting affidavit, and complaint. Following a hearing, the court again granted HCJFS interim custody of S.P. and D.P.

{¶15} On April 22, 2022, the children's adult brother and his wife filed a petition for custody of both children and requested an emergency hearing. The magistrate found that the children were not at imminent risk of harm and denied the emergency hearing. On May 2, 2022, Mother filed a visitation complaint.

{¶16} On September 27, 2022, the magistrate adjudicated S.P. abused and both children dependent. During that hearing, Mother stipulated that her housing

5

situation remained the same as when the sister had been granted custody of the children. On December 19, 2022, the magistrate granted HCJFS's motions for temporary custody of the children and the first extension of temporary custody.

### C. HCJFS Moves to Modify Temporary Custody to Permanent Custody

{¶17} On March 8, 2023, HCJFS filed a motion to modify temporary custody to permanent custody pursuant to R.C. 2151.413(A). The complaint alleged that the children were not bonded to Mother, that she had abandoned the children as she had not visited them since December 2021, that the children were not bonded to Father due to his previous incarceration and S.P.'s refusal to visit with him, and that the sister was not in a position to care for the children due to her uncontrolled emotions around the children and her incarceration on criminal charges.

{¶18} The complaint highlighted Mother's "lengthy history with HCJFS concerning medical and educational neglect for both children," her history of "housing struggles," her acknowledgement that "as recently as December 2022 that her housing was not suitable for placement of the children," and her refusal to engage in services, including signing an ROI, completing a diagnostic assessment of functioning ("DAF"), and visiting with the children.

{¶19} The complaint further stated that the children were bonded to their foster family, that their behavior and grades had improved while living with the foster family, and that the foster family wished to adopt them. The complaint noted D.P.'s cognitive delays, individualized education plan, and the progress he had made while with the foster family. The complaint reflected that the children had been in the agency's temporary care for 12 or more months of a consecutive 22-month period. It stated that a legally secure permanent placement for the children could not be achieved without a grant of permanent custody.

6

**{¶20}** The children's guardian ad litem ("GAL") filed a report in May 2023 in support of HCJFS's permanent-custody motion.

## D. *The Magistrate Conducts an In-Camera Interview with the Children*

**{¶21}** On April 24, 2023, counsel for Father filed a motion to grant a second extension of temporary custody to HCJFS. At Father's request, the magistrate conducted an in-camera interview of both children on June 15, 2023. The magistrate's June 15, 2023 entry generally reflected that both children expressed their wishes as to permanent placement. On June 28, 2023, the magistrate appointed an *In re Williams* attorney for the children based on the children's statements during the in-camera interview, indicating that their wishes differed from those of their GAL. *See In re Williams*, 2004-Ohio-1500, ¶ 16-21, 25, 29 (the child at issue was a party to the parental-termination proceedings and had the right to independent counsel to represent her legal interests and protect her constitutional and other legal rights). That same day, the adult brother appeared before the court and withdrew his petition for custody of both children.

## E. *HCJFS Semi-Annual Reports*

**{¶22}** A June 2022 semi-annual report ("SAR") stated that Mother had not engaged in any services during that review period; she had not visited the children since December 2021, still refused to sign an ROI, did not have a working phone, had not maintained contact with HCJFS, and had not demonstrated any behavioral changes. The SAR filed in December 2022 stated more of the same.

**{¶23}** The June 2023 SAR reflected that, although Mother would contact the caseworker, the 241-KIDS hotline, and the school regarding the children's medication, she would not respond to the caseworker's phone calls or text messages. The report stated that Mother continued to refuse to sign an ROI or discuss services with the

caseworker, and she was asked to complete a DAF, take parenting-enrichment classes, and complete intake for visitation. Mother's last visit with the children was reportedly in July 2022, when she attended one of Father's visits.

**{¶24}** The November 2023 SAR stated that Mother had not visited the children since July 2022, that her housing and income had not been verified, and that she had not signed an ROI or completed a DAF. The report stated that Mother would leave the court before the caseworker could speak with her about the case.

### F.   The Hearing on the Permanent-Custody Motion

**{¶25}** The hearing on HCJFS's permanent-custody motion commenced on January 18, 2024, but it was continued after the children's sister requested that Mother be appointed a GAL. The magistrate appointed a GAL, and in November 2024, appointed counsel for Mother at the request of Mother's GAL.

**{¶26}** HCJFS filed its May 2024 SAR, which reported that Mother had not had contact with HCJFS, had not visited the children, and had asked the caseworker to stop sending her letters. It further reported that Mother's mental health remained a concern, and HCJFS did not know if Mother was in treatment. The October 2024 SAR stated more of the same but added that Mother had not communicated with the children's GAL.

**{¶27}** The hearing on the permanent-custody motion resumed on February 14, 2025.

### 1.   The Caseworker's Testimony

**{¶28}** The caseworker testified that HCJFS had become involved due to Mother's unstable, untreated mental health. The caseworker was assigned to the case in December 2021. She explained that Mother's failure to complete an ROI or DAF prevented the agency from making referrals for services. The caseworker further

8

explained that an ROI was needed to make a referral so Mother could continue visitation, as the caseworker could no longer supervise visits due to the agency's limited number of visits it could supervise for a family. The caseworker testified that she attempted to explain why the ROI was necessary, but Mother would respond in a "[v]ery nasty" manner. The caseworker testified that she had been unable to communicate with Mother since Mother stopped visiting the children in 2022, later adding that Mother refused to speak with her. The caseworker stated that Mother never explained why she would not engage with the agency. The caseworker recalled times when Mother visited the children and was "rude and disrespectful," including yelling at her, to the point where she informed Mother that she would end the visit if her behavior did not change.

{¶29} As to Mother's housing, the caseworker recalled visiting Mother's home and seeing a board blocking the steps leading to the front door, old mattresses leaning against a side door, and an old stove outside. The caseworker, however, did not have an opportunity to see inside the home. The caseworker explained that she was required to make three attempts monthly to assess Mother's home. She further testified that the Statewide Automated Child Welfare Information System ("SACWIS") records showed that Mother historically had no water or heat in the home. The caseworker stated that the agency was unable to verify Mother's income.

{¶30} The caseworker testified that S.P. and D.P. were doing well in their respective placements,[1] and that their caregivers met the children's needs and wished to adopt them. She explained that both children were receiving case-management services for their respective medical and educational needs, and that neither parent

---

[1] While the children were initially placed in the same home, they were placed in separate foster homes prior to the hearing on the permanent-custody motion.

had attended medical appointments or educational meetings for either child.

### 2. Mother's Testimony

**{¶31}** Mother testified that she had a three-bedroom home with furniture in it for the children. Mother admitted she was not employed and explained that she would get financial support from family members if the children were returned to her. Mother testified that she did not have running water at her residence at that time, but that she would bring water into the home for multiple purposes, such as bathing and washing dishes.

**{¶32}** Mother recalled last seeing D.P. in November 2024 when she attended one of Father's visits, and S.P. in June 2022. Mother testified that the caseworker informed her that the caseworker would not supervise Mother's future visits, and that Mother was told the ROI needed to be signed to continue visits with the children. Mother testified that she did not sign because she did not feel comfortable doing so.

**{¶33}** Mother did not know her mental-health diagnoses, and her overall testimony regarding her mental health was incoherent.

### G. The Magistrate Grants HCJFS's Motion for Permanent Custody[2]

**{¶34}** The magistrate determined that the children had been in the agency's custody for 12 months out of a consecutive 22-month period under R.C. 2151.414(B)(1)(d) because the children had been in HCJFS's custody from the time when they were removed from the sister's custody on December 9, 2021. The magistrate turned to whether any of the best-interest factors under R.C. 2151.414(D)(1) applied.

---

[2] The magistrate's entry addressed Father and the children's prior custodian, however, only references to Mother are included for the purposes of this appeal as only Mother has appealed.

### 1. The Children's Interactions and Interrelationships—R.C. 2151.414(D)(1)(a)

**{¶35}** The magistrate noted that "[i]t was clear to the Court that Mother and Father love their children" but found that "the children have suffered by not having a consistent and ongoing relationship with either parent throughout the case." The magistrate considered Mother's admission that she did not visit the children between early 2022 and early 2025 and that, before that period, Mother refused to sign an ROI so that she could be referred for supervised visits at a court-approved facility "as is standard and common practice" because HCJFS could not continue to supervise the visits. The magistrate found that Mother never arranged visits to the children or made requests to visit them between early 2022 and early 2025. The magistrate further found that Mother had sporadic contact with HCJFS beginning in mid-2022.

**{¶36}** The magistrate found that neither of the children's parents had attended the children's school meetings, exhibited "adequate or accurate knowledge about the needs of the children, the interventions in place to assist the children, or the ongoing planning for these needs," and that Mother "refused to engage with the agency such that she could participate."

**{¶37}** The magistrate stated that HCJFS had facilitated placements with the children's adult siblings, including the brother, with whom the children visited for a period, but the brother discontinued those visits. The entry alluded to the children's previous placement with their adult sister, which ended due to allegations of physical abuse. The entry noted that the children "were placed together for a time but reportedly have done better when placed separately," and they are bonded to their current caregivers, who have adequately addressed each child's special needs and want to keep the children in their care.

11

### 2. *The Wishes of the Child—R.C. 2151.414(D)(1)(b)*

**{¶38}** While noting that "[b]oth children have at times vacillated regarding their desire for their long-term placements," the magistrate found that the children's GAL supported a grant of permanent custody. S.P. stated that she wanted her caregiver to adopt her in November 2024, and D.P. stated that he wanted to remain in his current placement at about the same time. The magistrate further noted that neither child had changed their position before trial.

### 3. *The Custodial History of the Children—R.C. 2151.414(D)(1)(c)*

**{¶39}** The magistrate found that D.P. and S.P. had been "outside the care of their parents or former legal custodian, for 41 months without interruption," which represented "over a quarter of [D.P.'s] life" and "over a third of [S.P.'s] life." The magistrate added that the children were previously placed in the agency's custody on October 14, 2016, and remained there until January 14, 2021, when custody of the children was granted to their sister.

### 4. *The Children's Need for a Legally Secure Permanent Placement—R.C. 2151.414(D)(1)(d)*

**{¶40}** The magistrate concluded that a legally secure placement could not be achieved without a grant of permanent custody to HCJFS because (1) Mother had visited the children only from December 2021 until early or mid-2022, refused to sign an ROI, and failed to consistently engage in case-plan services, (2) Mother only visited the children in March of 2025 because Father invited her to attend one of his visits, (3) Mother never gave HCJFS a reason for her refusal to work towards reunification nor did she provide an explanation at trial, (4) Mother's mental health "is virtually an unknown" as she failed to engage in a DAF or any other mental-health services and she "disavows any mental health concerns," (5) Mother's housing "is also virtually an

unknown" as she did not permit HCJFS to inspect her home to determine whether it was safe for the children, whether there was space and furniture for the children, and whether anyone else lived in the home, and (6) Mother reported that she was working but failed to show proof of income. The magistrate reiterated Mother's failure to participate in any of the children's educational or health-care meetings, and that the children had spent most of their lives "in and out of substitute care" due, in part, to "concerns for Mother's mental health."

### 5. Whether Factors Enumerated in R.C. 2151.414(E)(7)-(11) applied— R.C. 2151.414(D)(1)(e)

**{¶41}** The magistrate found that the R.C. 2151.414(E)(10) factor applied because Mother had abandoned the children. Although the magistrate initially found that the children had been in the agency's care for at least 12 months of a consecutive 22-month period under R.C. 2151.414(B)(1)(d), the magistrate's entry stated,

> From the evidence adduced, the Magistrate finds that clear and convincing evidence established the following:
>
> The children cannot be placed with either parent within a reasonable time.
>
> The children should not be placed with either parent.
>
> The children's continued residence in or return to the home would be contrary to their best interest and welfare.
>
> It is in the best interest of the children to be committed to the permanent custody of Hamilton County Job and Family Services.

Based on the foregoing, the magistrate found that placing the children in HCJFS's permanent custody was in their best interest.

### H. Mother Objects to the Magistrate's Decision

**{¶42}** In her objection to the magistrate's decision, Mother (1) asserted that the magistrate's decision was against the manifest weight of the evidence and (2) challenged the magistrate's findings of fact and conclusion that the children could not or should not be returned to either parent within a reasonable time or that returning the children to Mother's care would be contrary to their best interest and welfare. Mother argued that there was no clear and convincing evidence to show that she had a significant mental-health issue that would affect her ability to parent the children, or that "the children were negatively affected by Mother's inconsistent visits." Mother further argued that she "had an adequate place of residence for the children to live, and plumbed-water access in the residence is not an absolute requirement to meet the basic needs of the children," where Mother had "plenty of stored water in the house for any basic needs,"[3] and that she had sufficient income to meet the children's basic needs.

**{¶43}** On July 16, 2025, Mother's GAL filed a response to Mother's objection. The GAL argued that the evidence presented at trial supported the magistrate's decision to grant permanent custody to HCJFS and that it was not in Mother's best interest to have the children returned to her legal custody.

### I. The Juvenile Court's Judgment

### 1. The Court Denies Mother's Objection

**{¶44}** The juvenile court rejected the arguments raised in Mother's objection. As to the magistrate's finding that "the children have suffered by not having a consistent and ongoing relationship with either parent throughout the case," the court

---

[3] Mother made the same argument during the hearing on the sister's petition for custody of S.P. and D.P.

found that Mother had not visited the children for over two years. The court also found that Mother had abandoned the children due to her failure to visit them. The court further determined that Mother's challenge to the magistrate's finding that "Mother never gave HCJFS a reason for her refusal to work towards reunification," and her assertion that HCJFS was "merely speculating that Mother had mental health issues" were not well-taken because Mother testified that she did not want to sign a ROI, "which led to Mother not visiting with the children for over two years and not engaging in any case plan services."

{¶45} The juvenile court addressed Mother's challenge to the magistrate's finding that "neither parent has adequate or accurate knowledge about the needs of the children, the interventions in place to assist the children, or the ongoing planning for these needs." The court considered the caseworker's testimony that both children had individualized services, that S.P. struggled with depression and suicidal ideations, and that D.P. was being assessed for autism. The court reiterated the fact that Mother went without seeing the children for over two years.

{¶46} The juvenile court disagreed with Mother's assertions that the magistrate's findings were against the manifest weight of the evidence. Finding that Mother had not engaged in any case-plan services since the children were removed from their sister's custody and committed to HCJFS's temporary custody, the court reiterated Mother's failure to visit the children "for a significant amount of time." The court added that HCJFS was unable to gain access to Mother's home to assess its suitability and noted Mother's testimony that the home had no running water, that she was not employed, and that she would rely on family for financial support for the children.

### 2. *The Juvenile Court Approves and Adopts the Magistrate's Decision*

**{¶47}** Upon the juvenile court's independent review of the record, it found that the magistrate properly determined the factual issues and appropriately applied the law. The court determined that the evidence supported the magistrate's decision. The juvenile court reiterated much of the magistrate's findings as to R.C. 2151.414(B)(1)(d) and the magistrate's best-interest analysis pursuant to R.C. 2151.414(D)(1)(a)-(e) in its analysis, making a few additional findings as to the best-interest factors as reflected below.

**{¶48}** As to R.C. 2151.414(D)(1)(a), the court found that Mother's visits did not progress past a supervised setting, and that the children, though in separate placements, are "close and visit with each other." As to R.C.2151.414(D)(1)(c), the court found that the children had been out of the care of both parents and their sister since December 2021.

**{¶49}** Regarding R.C. 2151.414(D)(1)(d), the juvenile court found that Mother failed to complete a DAF, "attend therapy classes, participate in Med Som," and attend visitation with the children. The court found that the caseworker "had sporadic contact with Mother throughout the case" despite the caseworker sending letters and attempting to "pop up" at Mother's home. It reiterated Mother's failure to remedy the issues regarding the suitability of her home and to verify her income.

**{¶50}** The court found that nine-year-old D.P. had been in a specialized foster home since 2023, was diagnosed with ADHD, was being assessed for autism, attends weekly individual therapy, and is prescribed medication. Eleven-year-old S.P.—who is placed with a nonkinship relative—is engaged in services, attends therapy, and has a mentor to address her diagnoses of depression, suicidal ideation, and suicide attempts. The court noted that the children's respective caregivers "have kept up with the

children's appointments and services for their individual needs."

{¶51} The court's entry further reflected that the children were removed from their previous placement due to physical abuse, and that an older sibling filed a petition for legal custody but withdrew it.

{¶52} The court concluded that a legally secure permanent placement could not be achieved without a grant of permanent custody to HCJFS as the children's sister, the previous legal custodian, was incarcerated, Mother had not visited with the children for a significant amount of time and had not completed any case-plan services, Father testified that he was not in a position to take the children at the time of the hearing and had requested a six-month extension to obtain stable housing and income, and no relatives had been deemed appropriate to care for the children at the time of the hearing.

{¶53} As to R.C. 2151.414(D)(1)(e), the court found that Mother abandoned the children under R.C. 2151.414(E)(10) based on the time she went without visiting the children, and that the sister also abandoned the children.

{¶54} The court found that HCJFS had met its burden to show, by clear and convincing evidence, that a grant of permanent custody to HCJFS was in the children's best interest. The juvenile court, having denied Mother's objection to the magistrate's decision, approved and incorporated the magistrate's decision in its entry.

{¶55} This appeal followed.

## II. Analysis

{¶56} Mother asserts in a single assignment of error that the juvenile court's decision was not supported by sufficient evidence and was against the manifest weight of the evidence.

### A. Standard of Review

**{¶57}** R.C. 2151.413(A) provides that, after the juvenile court adjudicates a child abused, neglected, or dependent under R.C. 2151.353(A)(2), an agency may file a motion to commit the child to its permanent custody. To terminate parental rights and grant permanent custody to the agency, R.C. 2151.414(B)(1) requires that the court determine at the hearing by clear and convincing evidence that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the conditions listed in R.C. 2151.414(B)(1)(a)-(e) apply. *See In re N.M.P.,* 2020-Ohio-1458 ¶ 15-16; *In re B.H.*, 2024-Ohio-423, ¶ 37 (1st Dist.). In determining the best interest of a child, the juvenile court must consider the nonexhaustive list of relevant factors outlined in R.C. 2151.414(D)(1). *See In re B.H.* at ¶ 37; R.C. 2151.414(B)(1).

**{¶58}** In reviewing a juvenile court's decision terminating parental rights under R.C. 2151.414, this court applies a sufficiency of the evidence and/or a manifest weight of the evidence standard of review, depending upon the nature of the arguments raised. *In re Z.C.*, 2023-Ohio-4703, ¶ 11. "Sufficiency of the evidence and manifest weight of the evidence are distinct concepts[.]" *Id.* at ¶ 13.

**{¶59}** While Mother raises insufficiency of the evidence on appeal, she did not do so in her objection to the magistrate's decision below, nor does she advance a plain-error argument on appeal. "Except for a claim of plain error, a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion . . . unless the party has objected to that finding or conclusion as required by Juv.R. 40(D)(3)(b)." *In re G.W.*, 2024-Ohio-1551, ¶ 24 (1st Dist.), quoting Juv.R. 40(D)(3)(b)(iv). Because Mother failed to raise her insufficiency argument below, we will not consider the argument on appeal. Similarly, because Mother fails to advance

a plain-error argument on appeal, we will not do so on her behalf. *See In re C.C.,* 2024-Ohio-5013, ¶ 8, 10-11 (1st Dist.) (holding that this court need not create a plain-error analysis where an appellant fails to develop one).

### B.  The Juvenile Court's Decision Was Not Against the Manifest Weight of the Evidence

{¶60}  When reviewing a challenge to the manifest weight of the evidence, we must "weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving conflicts in the evidence, the [juvenile] court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *In re A.B.*, 2015-Ohio-3247, ¶ 16 (1st Dist.), citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 12.

### 1.  R.C. 2151.414(B)(1)

{¶61}  R.C. 2151.414(B)(1) provides that a child is considered to have entered the temporary custody of an agency based on the date when the child was adjudicated, or the date that is 60 days after the child was removed from their home, whichever is the earlier date.

{¶62}  The children were placed in HCJFS's interim custody on December 9, 2021. On September 27, 2022, S.P. was adjudicated abused, and both children were adjudicated dependent. Accordingly, the children entered HCJFS's temporary custody on February 9, 2022, which is 60 days after the children were removed from the previous custodian's care.[4]  Therefore, the children had been in the agency's custody

---

[4] R.C. 2151.414(B) provides that "a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated . . . or the date that is sixty days after the removal of the child from the home." Here, the earlier date is 60 days after the children were removed on December 9, 2021, as the adjudication on the agency's complaint was not made until September 27, 2022.

for over 12 consecutive months under R.C. 2151.414(B)(1)(d).[5]

{¶63} We next consider the best-interest factors under R.C. 2151.414(D)(1)(a)-(e).

### 2. *The Children's Interactions and Interrelationships*

{¶64} Mother first addresses the court's consideration of the children's interactions and interrelationships under R.C. 2151.414(D)(1)(a). As to her failure to visit the children for nearly three years, Mother asserts that the ROI was not explained to her, and that the caseworker told her she would not supervise Mother's visits.

{¶65} We reject Mother's explanation for failing to visit the children, as the case plan initially alerted the court to Mother's refusal to sign the ROI to continue supervised visits with the children, and the caseworker testified that she explained to Mother that she could not be referred to a visitation facility without first signing the ROI.

### 3. *The Children's Wishes*

{¶66} As to the wishes of the children under R.C. 2151.414(D)(1)(b), Mother asserts that the children expressed that they wished to be returned to her custody, that the children previously lived with her, and that she remained in contact with the children via telephone when she did not visit the children. This argument is meritless, however, as the record shows that, although the children were appointed an *In re Williams* attorney, the GAL ultimately reported that both children wished to remain in their respective placements. Further, no evidence to the contrary was presented.

---

[5] While R.C. 2151.414(B)(1)(d) considers whether a child has been in custody for 12 months of a consecutive 22-month period, "nothing in the plain language of the statute requires a public agency to wait until a child has been in its custody for [22] months before filing a motion for permanent custody." *In re K.K.*, 2025-Ohio-4376, ¶ 81 (8th Dist.), quoting *In re T.R.*, 2025-Ohio-2531, ¶ 34 (8th Dist.), citing *In re N.M.P.*, 2020-Ohio-1458, ¶ 23. Therefore, this factor is met although the children had been in the agency's custody for approximately 16 months.

Further, the juvenile court agreed with the magistrate's decision that the children's desire to remain with their respective foster families had not changed as of the date of the hearing on the permanent-custody motion.

### 4. *Placement Could Not Have Been Achieved Without a Grant of Permanent Custody*

{¶67} Mother next argues that the children could have been placed with her within a reasonable amount of time or should have been placed with her. *See* R.C. 2151.414(B)(1)(a). She contends that placement could have been achieved without a grant of permanent custody because she had financial support and "was registered with a temp service for work and income." *See* R.C. 2151.414(D)(1)(d). Mother asserts that, had she been given additional time to complete case-plan services, the children could have been returned to her.

{¶68} Mother had sufficient time—from the date when the children were placed in HCJFS's custody on December 19, 2021, until March 6, 2023, when HCJFS filed its permanent-custody motion—to engage in case-plan services. The hearing on the agency's motion was continued numerous times between October 3, 2023, when it was initially scheduled, and February 14, 2025, when it finally commenced. Mother, however, continued to fail to engage in case-plan services. Further, Mother's GAL reported that returning the children to Mother's care was not in Mother's best interest.

{¶69} There is nothing in the record to suggest that the juvenile court lost its way or created a manifest injustice by granting HCJFS's motion for permanent custody. Mother's sole assignment of error is, therefore, overruled.

### III. *Conclusion*

{¶70} Where the record is clear that Mother failed to engage in case-plan services, the juvenile court's judgment granting permanent custody of the children to

HCJFS was not against the manifest weight of the evidence. Accordingly, we affirm the juvenile court's judgment.

Judgment affirmed.

**ZAYAS, P.J.,** and **NESTOR, J.,** concur.